William and Dorothy **TALLMAN**,
Plaintiffs,

v.

**Lillie M. TABOR et al., Defendants.**

No. 93–CV–72463–DT.

United States District Court,
E.D. Michigan,
Southern Division.

July 20, 1994.

Amos E. Williams and Thomas E. Kuhn, Detroit, MI, for plaintiffs.

Margaret A. Nelson, Lansing, MI, for defendants.

## *OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

### I. *INTRODUCTION*

Plaintiffs William and Dorothy Tallman initiated this action on June 14, 1993, against Defendants, who are employees of the Michi-

gan Department of Social Services ("DSS").[1] In their amended complaint, Plaintiffs claim that Defendants violated their rights to be free from race discrimination under the U.S. and Michigan Constitutions by the way they handled the placement of one of Plaintiffs' former foster children, Jeanette Brandon. *See* Amended Complaint, Counts II & IV. Plaintiffs also claim that Defendants' actions with respect to Jeanette's placement were grossly negligent. *Id.*, Count III.[2] Plaintiffs do not seek custody of Jeanette, and, indeed, the Court would be powerless to order such a remedy. Instead, Plaintiffs seek damages for this alleged wrongful conduct.

Defendants filed a motion for summary judgment on March 31, 1994. Plaintiffs responded on June 2, 3 and 29, and Defendants replied on June 15. After reviewing the pleadings filed by the parties, and after hearing oral argument on this motion on June 30, 1994, the Court is prepared to rule on Defendants' motion. This memorandum opinion and order sets forth that ruling.

## II. *FACTUAL BACKGROUND*

Defendants have offered a largely undisputed statement of facts which this Court will rely upon unless otherwise indicated.

Plaintiffs are a white couple who have been licensed foster care parents since 1972. Over the years they have received children for foster care placement from Macomb County Department of Social Services and, until 1989, from Wayne County Department of Social Services ("WCDSS"). According to Defendant Linda Record's undisputed testimony, Plaintiffs had adopted at least two African–American foster children with WCDSS's assistance prior to their involvement with Jeanette. Record Dep., p. 37.

Plaintiffs and WCDSS entered into an Agency/Foster Parent Agreement, which explained the rights and duties of each party. *See* Defendants' Brief, Ex. 8. The agreement provides, *inter alia,* that WCDSS agrees "[t]o provide an explanation for removing a child from the foster home...." *Id.* at 1. The Plaintiffs, for their part, agreed "[t]o accept the agency's final responsibility for placement decisions" and "[t]o cooperate in planned visits or placement with the child's natural parents, or with other persons important in the child's life." *Id.* at 2.

On June 14, 1984, Debbie Milton gave birth to Jeannette Brandon. Ms. Milton and Jeanette are both African–American. On July 28 of that same year WCDSS placed her in the Plaintiffs' foster home. Jeanette was what is known as a "special needs" child. As such, she required additional physical and/or psychological care for which Plaintiffs received extra compensation.

On July 9, 1985, Ms. Milton had her second child, Doris Brandon. WCDSS eventually placed Doris in the foster home of Don and Cheryl Parker in February, 1988. Mr. and Mrs. Parker are a biracial couple; Mr. Parker is African–American and Mrs. Parker is white. According to the uncontradicted testimony of Ms. Record, the reason Doris was placed in a different foster home than her older sister was Mrs. Tallman's refusal to accept Doris because she was not a special needs child for whom the premium rate would be paid. Record Dep., p. 38.

At the time of Jeanette and Doris' births, Ms. Milton was herself a ward of the State of Michigan. The State did not terminate her wardship until January, 1988. Following the termination of her wardship, Ms. Milton gave birth to a third child, Silvana. Ms. Milton has had uninterrupted custody of Silvana since her birth.

Jeanette and Doris' father, Johnny Brandon, died of cancer in February, 1988. He was survived by his parents, Jeanette and Doris' paternal grandparents. Mr. and Mrs. Brandon are African–American.

---

1. Of the six Defendants in the caption, two were not served (Lillie Tabor and Pat Balasco), and two were dismissed by stipulation immediately before the summary judgment hearing (Renee Hayward and Robert Fenchuk). Thus, only Linda Record and Evelyn Walker remain as Defendants.

2. Count I of Plaintiffs' amended complaint stated a claim under the Michigan Elliott–Larsen Civil Rights Act. However, the parties stipulated to the dismissal of this count on April 4, 1994. *See* Stipulation.

Evelyn Walker was the WCDSS social worker assigned to Jeanette and Doris' cases in August, 1988. Her immediate supervisor was Robert Fenchuk, whose supervisor, in turn, was Linda Record. Renee Hayward was apparently Ms. Record's supervisor. Ms. Hayward was WCDSS' Deputy Director for Children and Youth Services. Ms. Hayward's supervisor was Lillie Tabor, WCDSS' Director.[3] Ms. Walker and Ms. Hayward are African–American, and the other named Defendants are white.

At the time Ms. Walker took over the Brandon girls' cases, the WCDSS plan for each was to return them to their mother. This changed in June, 1989, when, apparently at the prompting of Wayne County Probate Court Referee Seymour Weberman, Ms. Walker filed a petition to terminate Ms. Milton's parental rights. If termination was granted, WCDSS would then assume custody of the girls.

Ms. Walker explained that there were two reasons behind WCDSS' petition for termination of parental rights. First, Ms. Milton was not making satisfactory progress in developing her parenting skills in order to care for all three of her children. See Plaintiffs' Brief, Ex. 7 (June 14, 1989 Findings and Recommendations of Foster Care Review Board[4]). Second, Ms. Milton had expressed an interest in putting her children up for adoption, particularly if both could be placed together. See Walker February 17, 1994 Dep. ("Walker Dep. II"), pp. 33–39.

Ms. Walker testified that Mrs. Tallman had made her interest in adopting Jeanette known since she assumed the case in 1988.

She also testified that she approached Mrs. Tallman about placing Doris in Plaintiffs' foster care sometime in early 1989, but that Mrs. Tallman expressed only an interest in Jeanette. See Walker Dep. II, pp. 18–20; see also Walker February 25, 1993 Dep. ("Walker Dep. I"), pp. 26–27.[5] After the Tallmans refused to care for both Doris and Jeanette, Ms. Walker approached the Parkers about being foster parents to both girls. They also declined because their foster home did not have room for another child. Walker Dep. II, p. 18.

It is undisputed that placement of both girls in the same home was a priority. Ms. Walker, therefore, sought out relatives who would be interested in caring for both girls after both sets of foster parents had turned down that opportunity. Mr. and Mrs. Brandon then came forward and indicated a willingness to plan for the girls. As a result of their interest, Ms. Walker modified the case plan from WCDSS permanent custody to placement with the Brandons. See Plaintiffs' Brief, Ex. 8 (December 8, 1989 review by Foster Care Review Board). She also began in July, 1989 to conduct visits between the girls and their mother and grandparents at the Brandons' home.

At a January 23, 1990 probate court hearing, WCDSS recommended that the petition to terminate Ms. Milton's parental rights be dismissed because Ms. Milton had made progress towards assuming care for the children and because their grandparents had come forward as well. Walker Dep. II, p. 56.[6] Referee Weberman agreed to this rec-

---

3. The remaining named Defendant, Pat Balasco, is largely unmentioned in the record. Apparently, she was also in the WCDSS chain of command above Ms. Walker.

4. The Foster Care Review Board is a committee of lay persons which provides advisory recommendations on certain cases to the courts and DSS. With respect to the Brandon girls, the Board consistently resisted the suggestion that they be returned to their mother, and, instead, supported the termination of her rights and placement of the girls either with either the Brandons or the foster parents. See Plaintiffs' Response Brief, Exs. 5–10 (Findings and Conclusions of Board at six different hearings between May 13, 1988, and December 5, 1990). Accord-

ing to both Ms. Record and Ms. Walker, the Department does not give much weight to the Board's recommendations because of their lay status. See Record Dep., p. 34.

5. The record supports Ms. Walker's testimony that Plaintiffs were indeed hesitant to commit to making plans for Doris prior to October, 1990. See Dorothy Tallman's Dep., Ex. 7 (October 22, 1990 letter from Mrs. Tallman and Mrs. Parker indicating that Plaintiffs had recently decided to try to plan for both Brandon girls).

6. Ms. Record testified that in cases in which family members step forward, termination of parental rights rarely occurs. Record Dep., p. 35.

ommendation, and he also ordered increased visitations with the Brandons.

Plaintiffs then took a number of steps to gain custody of Jeanette, which are best set out in *Tallman v. Milton,* 192 Mich.App. 606, 482 N.W.2d 187, 189 (1992):

> In March, 1990, plaintiffs petitioned WCDSS to modify visitation, requested independent psychological evaluation of all interested parties, and requested reassignment of Jeanette's case to a different caseworker. On April 10, 1990, plaintiffs filed a petition in probate court to intervene as a party. The hearing was set for July 31, 1990. On July 30, 1990, plaintiffs filed the instant action pursuant to the Child Custody Act in Macomb Circuit Court. The DSS filed a motion to dismiss the circuit court proceedings "on grounds of lack of jurisdiction given the probate court's continuing jurisdiction over Jeanette." Meanwhile, the probate court held matters in abeyance until the circuit court ruled.

The *Tallman* opinion also provides a good factual summary of what happened next:

> On August 31, 1990, defendant Milton abducted Jeanette and her sister from their grandparents' home.
>
> On September 26, 1990, the circuit court granted DSS' motion to dismiss, indicating that it "reluctantly conclude[d] that it should not exercise jurisdiction under the Child Custody Act of 1970 in this case" because of the pending Wayne County Probate Court proceeding.
>
> On October 3, 1990, defendant Milton returned the children to the DSS. The DSS asserts in its brief:
>
>> The childrens' physical condition appeared fine. The children said that they wanted to stay together and that they did not want to go back to their foster homes. The children were placed together on October 3, 1990, in foster care at Christ Child House where they received a complete psychological and physical assessment as well as being observed. They remain[ed] at Christ Child House until further order of the probate court.
>
> On October 31, 1990, the referee granted plaintiffs the right to intervene in the pending juvenile proceedings in probate court and, according to DSS' brief, "granted visitation for the mother [defendant Milton], the plaintiffs and other foster parents ... and the paternal grandparents under the Department's supervision." On December 12, 1990, Wayne County Probate Judge Frances Pitts reversed the decision of the referee, ruling that there was no statutory basis for plaintiffs to have standing to intervene. And, although there was no statutory basis for visitation with plaintiffs, the probate court allowed it if the referee determined it to be in the best interests of the child.
>
> Plaintiffs filed an application for leave to appeal from the probate court's order on December 28, 1990, in Wayne Circuit Court. On February 19, 1991, the probate court ordered Jeanette and her sister returned to their natural mother, defendant Milton. On May 10, 1991, the Wayne Circuit Court denied plaintiffs' application for leave to appeal.
>
> In this case, plaintiffs appeal as of right from the Macomb Circuit Court order dismissing their complaint under the Child Custody Act. Plaintiffs also later in a separate filing with this Court, Docket No. 140891, sought leave from this Court to appeal from the Wayne Circuit Court's order denying them leave to appeal from the probate court's order precluding their intervention in the juvenile proceedings for lack of standing.

482 N.W.2d at 189–90.

The *Tallman* court went on to affirm both lower court decisions on the ground that Plaintiffs lacked standing to challenge the return of the children to their natural parent. The court relied upon the Agency/Foster Parent Agreement cited above between WCDSS and Plaintiffs to hold that they were bound to their promise to cooperate with the agency in returning the children to Ms. Milton. In the court's words:

> The foster parents were engaged by DSS and by the probate court to facilitate family reunification. Foster parents exist to serve both the child and the natural par-

ents. This is not consistent with giving standing to the foster parents to get into a custody war with the same people (the natural parents) they were hired to help. 482 N.W.2d at 192.

Elaborating on the facts as set forth in *Tallman, supra,* Ms. Milton abducted Jeanette and Doris when they were on a scheduled visit at their grandparents' home. At that time, the case plan, over the objection of the Foster Care Review Board, was to return the children to their mother with an intermediate placement with the grandparents. *See* Plaintiffs' Response Brief, Ex. 9 (June 12, 1990 Findings and Recommendations of the Foster Care Review Board). When Ms. Milton returned the children to WCDSS on October 3, 1990, the Department, on orders apparently from Ms. Hayward, arranged for their placement at Christ Child House. According to Mr. Fenchuk, the reason for selecting placement at Christ Child House was that it provided a neutral, high-quality setting in which to assess the children. Defendants' Brief, Ex. 2, pp. 31–32 (Fenchuk Dep.).

Ms. Hayward also convened a meeting for all interested parties on October 3, 1990, to inform them of the status of the case. *See* Defendants' Brief, Ex. 4, p. 18 (Hayward Dep.). The record is unclear on what exactly transpired at this meeting. Ms. Hayward did testify, however, that Plaintiffs' attorney, Mr. Amos Williams, Esq., represented to her that his clients intended to sue WCDSS for interfering in a white woman's attempt to adopt an African–American child. Hayward Dep., pp. 21–22. Ms. Hayward made no response to this representation.

According to Defendants' uncontested assertions at oral argument on their motion, WCDSS ordered two psychological examinations of Jeanette and Doris while they were at Christ Child House to determine where they should be ultimately placed. One study, performed by the Clinic for Child Study, recommended that the children be placed

with their grandparents and that contact with Ms. Milton continue. An independent psychiatrist selected by both WCDSS and the foster parents recommended that the children be placed with the Parkers.

As noted in the *Tallman v. Milton* excerpt above, in early 1991, WCDSS recommended, and Judge Pitts agreed, that Ms. Milton regain custody of Jeanette and Doris under the Department's continuing supervision. Apparently, WCDSS' recommendation was based on Ms. Walker's belief in late 1990 and early 1991 that Ms. Milton could care for all of her girls because she had been successfully caring for Silvana and two younger relatives. Walker Dep. II, pp. 61–63. Ms. Record also testified that a report from the Christ Child House indicated that the girls reacted well to their mother and that Jeanette was "stand-offish" with Mrs. Tallman. Record Dep., p. 24. WCDSS supervision of the Brandon girls ended by court order on March 17, 1992.

Plaintiffs do not seek custody of Jeanette, nor do they claim or offer any evidence that she is receiving improper care from Ms. Milton. Instead, Plaintiffs claim that the actions of Defendants in removing Jeanette from their household were based on racial animus. To prove racial animus, Plaintiffs rely primarily on Mrs. Tallman's testimony that in March, 1989, during one of the visits Ms. Walker arranged between Ms. Milton and Doris and Jeanette at the Plaintiffs' home, Ms. Walker expressed to her that "she did not think white people should adopt or foster black children." Dorothy Tallman Dep., p. 47. Plaintiffs also submitted copies of three reports made by Ms. Walker in early 1989 which note that placement of Jeanette with the Tallmans was "not racially congruent." *See* Plaintiffs' Supplemental Exhibits. Ms. Walker denies that she ever had a concern about the interracial nature of Plaintiffs' relationship to Jeanette. Walker Dep. II, p. 40.[7]

---

7. Mrs. Tallman also suggested in her deposition that the difficult relationship she had with Ms. Walker is further evidence of the latter's racial animus. There is no question that these two had a stormy course of dealing. Mrs. Tallman was generally unhappy with Ms. Walker's efforts to

involve the grandparents and to have long visits away from the Tallmans' home. Ms. Walker, in turn, complained that Mrs. Tallman would improperly cancel visits. Mrs. Tallman filed at least one formal complaint against Ms. Walker, which alleged that Ms. Walker had orally abused

Plaintiffs' claims against Ms. Record seem to flow from her refusal to investigate the Tallmans' accusations of racial discrimination. The record indicates that at some point both Mr. and Mrs. Tallman spoke to Ms. Record about their concerns. *See* Dorothy Tallman Dep., p. 70. Ms. Record recalls that Mr. Tallman brought up the issue of Ms. Walker's alleged bias, but she does not remember any conversation with Mrs. Tallman on the subject. Record Dep., pp. 52–53. In any case, Ms. Record states that she did not pursue the matter because she did not think it would be productive. *Id.* at 54.

### III. *ANALYSIS*

#### A. *THE STANDARDS GOVERNING CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT.*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court decisions— *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[8] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment:

[*] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

[*] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

[*] This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. * * *

[*] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

[*] The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

[*] The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*See Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989) (footnotes with citations omitted). The Court will apply the above principles in deciding Defendants' motion for summary judgment.

Jeanette over the telephone for not visiting Ms. Milton. *See* Dorothy Tallman Dep., Exs. 2–3.

8. "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright et al., *Federal Practice & Procedure,* § 2727, at 35 (Supp.1994).

## B. *PLAINTIFFS' FEDERAL CONSTITUTIONAL CLAIM MUST FAIL.*

### 1. *The Parties' Arguments.*

Plaintiffs' federal claim in this case is that WCDSS' handling of Jeanette's placement violated the Equal Protection Clause of the U.S. Constitution. Plaintiffs rely primarily on Ms. Walker's alleged comment that she did not believe that white people should foster or adopt African–American children to show that racial considerations prompted the removal of Jeanette from their home. Plaintiffs also cite reports by Ms. Walker made in early 1989 in which she noted that placement of Jeanette with the Tallmans was "not racially congruent."

The Defendants counter that the removal of Jeanette from the Tallmans' home was prompted by race-neutral considerations, most importantly, Michigan law's preference that children be raised by their natural parents if possible. In short, according to Defendants, this is a case in which the state's foster care system worked to reunite the family as it should, and that race had nothing to do with the decisions involved.

### 2. *Race Is A Permissible Factor In Decisions Regarding Placement Of Children.*

Defendants are correct that Michigan law expresses a preference for the reunification of children placed in foster care with their natural parents. M.C.L. § 712A.1 states (emphasis added):

> This chapter shall be liberally construed to the end that each child coming within the jurisdiction of the court shall receive care, guidance and control, *preferably in his or her own home,* as will be conducive to the child's welfare and the best interest of the state. If a child is removed from the control of his or her parents, the child shall be placed in care as nearly as possible equivalent to the care which should have been given to the child by his or her parents.

This preference is also expressed in the statute governing termination of parental rights:

> If parental rights of the children have not been terminated [pursuant to M.C.L. § 712A.19b(3) ] and the court determines at a permanency planning hearing that the return of the child to his or her parent would not cause a substantial risk to the child's life, physical health, or mental well-being, the court shall order the child returned to his or her parent. In determining whether the return of the child would cause a substantial risk of harm to the child, the court shall view the failure of the parent to substantially comply with the terms and conditions of the case service plan prepared under 18f of this chapter as evidence that return of the child to his or her parent would cause a substantial risk of harm to the child's life, physical health, or mental well-being.

M.C.L. § 712A.19a(4).

The DSS regulations governing foster care and adoption also clearly make race one of the factors to be considered in the decision of where to place children. With respect to adoption in particular, the DSS manual states:

> Within 30 working days of a determination that the child's plan is adoption, the adoption worker must complete a written adoption evaluation to include the following factors:
>
> \*     \*     \*     \*     \*     \*
>
> 6.  *A determination of the criteria for adoptive placement of the child based on consideration of the following factors:*
>
> \* Special physical and emotional needs of the child.
>
> \* Placement with siblings. Siblings shall be placed together whenever possible. If placement together with siblings is not considered in the child's best interest, document the reasons.
>
> \* Placement with relatives ...
>
> \* Maintaining continuity of current relationships.
>
> \*\* Placement with the child's psychological parents ...
>
> \*\* Placement that enables the child to maintain relationships with friends, teachers, etc.

\* *The child's race—identify the child's race, including the racial mix of a child of mixed racial parentage, and explain the role race has played in the life of the child.*

\* The child's religious preferences.

\* The child's wishes, particularly if the child is fourteen (14) or older.

\* Other factors particular to this child. While each factor must be taken into account, the weight given any one factor or combination of factors will vary from child to child.

The evaluation shall be approved by the worker's supervisor. Written approval or disapproval of the adoption evaluation by the referring local office is required for a child in purchased foster care and must be forwarded to the purchase agency within 7 days.

*See* Defendants' Brief, Ex. 9 (DSS Service Manual Item 732, pp. 1–2) (emphasis added). The manual continues:

CONSIDERATION OF RACIAL IDENTITY—Race as one of the placement selection factors must be taken into account, *but shall not be used as the sole criterion* in selecting adoptive parents.

*Id.* at p. 2 (emphasis in the original).[9] The manual also states with respect to adoptions:

Special emphasis must be placed on maintaining the relationship between the child and the foster parents which has existed for twelve (12) months or longer. Unless there are exceptional circumstances, the continuity of this relationship shall take precedence over other placement criteria developed for the child.

*Id.* at p. 4.

■ It appears well-settled in the case law that so long as racial considerations are not the sole reason for placement decisions, but only one of several factors, they do not run afoul of the Equal Protection Clause. *See, e.g., Palmore v. Sidoti*, 466 U.S. 429, 429–30, 104 S.Ct. 1879, 1880, 80 L.Ed.2d 421 (1984) (holding award of custody of white child to white father over white mother who had remarried to an African–American man solely because of racial considerations violated the Equal Protection Clause); *Drummond v. Fulton County Dept. of Family & Hum. Servs.*, 563 F.2d 1200, 1204–06 (5th Cir.1977) (en banc) (use of race as one factor in making adoption decisions is constitutional), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1141 (1978); *In re Davis*, 502 Pa. 110, 465 A.2d 614, 621–29 (1983) (trial court should have considered race as a factor in making foster placement decision). *See also* Kim Forde–Mazrui, Note, *Black Identity and Child Placement: The Best Interests of Black and Biracial Children*, 92 Mich.L.Rev. 925, 929–36 (1994) (analyzing cases holding race is a permissible factor if one of many in transracial child custody and adoption situations). Thus, even assuming that race did play a role in the decision to remove Jeanette from the Tallmans' home, in order to make out an equal protection claim, Plaintiffs must show that race was the sole or at least the predominant factor in that decision.

### 3. *Plaintiffs Have Failed To Establish That A Material Issue Of Fact Exists On Whether Race Was The Predominant Factor In The Placement Decision.*

■ The Court does not believe that Plaintiffs can meet their burden to show that a material issue of fact exists on the question of whether race was the predominant factor in the decision to remove Jeanette from Plaintiffs' care and eventually to return her to her mother. Ms. Walker's comment about the propriety of transracial placement—which the Court must at this stage of the case accept as having been made—indicates that race may have been a factor in her recommendations. However, the law cited above holds that considerations of race are not improper in placement decisions so long as they are not the primary concern. Here, the undisputed facts in the record demon-

---

**9.** The language indicating that race may be one factor, but not the sole factor, in making adoption (and foster care) placement decisions grew out of a consent decree entered by Judge Robert E. DeMascio of this bench in *Committee to End Racism in Michigan's Child Care System v. Mansour*, 85–CV–74348–DT. *See* Plaintiffs' Response Brief, Ex. 1.

strate that race was not the predominant factor in the decision to remove Jeanette from her foster parents.

First, with respect to Ms. Walker's recommendation in 1989–90 that Jeanette and Doris be placed with their paternal grandparents, there is no dispute that having the two girls in a single home was a priority and that a placement with the grandparents would facilitate continuing contact with Ms. Milton. Furthermore, Plaintiffs do not dispute that Ms. Walker had already approached them in early 1989 with the possibility of removing Doris from the Parkers—a biracial couple— and placing her in foster care with the Tallmans. While the Court is troubled that Ms. Walker may not have given the appropriate weight to the connection between the girls and their foster parents in making her recommendation that they be placed with the grandparents, it is satisfied that no reasonable jury could say that race was the predominant factor in her decisionmaking given her earlier offer of foster placement of both girls with Plaintiffs. If Ms. Walker had been insistent on not placing African–American children with white foster and/or adopting parents, she simply would not have offered the Plaintiffs an opportunity to care for Doris as well as Jeanette.

■ Similarly, the Court does not believe that a material question of fact exists on the question of whether Ms. Walker's recommendation that the petition to terminate parental rights be withdrawn was motivated primarily by racial considerations. Plaintiffs have not offered any evidence contradicting Ms. Walker's representation that at the time of the petition's withdrawal, January 23, 1990, Ms. Milton had made sufficient progress with respect to the service plan to preserve her parental rights. Although the Foster Care Review Board did not support a return of the children to her at that point, there is nothing in the record to suggest that clear and convincing evidence existed showing that she posed a substantial danger to the children— the standard required by statute for termination of rights. *See* M.C.L. § 712A.19b(3). This fact, combined with the statutory goal of reuniting families if possible, precludes a finding by any reasonable jury that racial

animus on the part of Ms. Walker was the predominant motive in the withdrawal of the petition.

■ In addition, no question of fact exists on whether the decision to place Jeanette and Doris at the Christ Child House following their abduction was primarily the result of racial considerations. The record clearly establishes that this decision was not Ms. Walker's, but, rather, Ms. Hayward's. Even if it was Ms. Walker's doing, the decision to place the children at Christ Child House was clearly race-neutral, in that both whites and African–Americans with an interest in the children were denied temporary custody. In light of these circumstances, the Court believes that there are no disputed facts from which it could be reasonably inferred that race had any impact on the decision to place the children in a neutral setting pending their final disposition.

■ The Court additionally believes that race was not the predominant factor behind WCDSS' ultimate recommendation to return the children to Ms. Milton. As noted above, it is undisputed that the statutorily mandated objective of WCDSS was to reunite the Brandon girls with their mother if at all possible. Plaintiffs have not offered any evidence that the decision to reunify the family was not in Jeanette's best interests, other than the Foster Care Review Board's advisory opinions. Importantly, the last of these that is of record is dated a full two months before the decision to return the children was made. There is no evidence, then, that Ms. Milton did not make sufficient progress towards regaining the children in the two to three months immediately prior to their return to win custody. Given all these circumstances, the Court cannot say that a reasonable jury would find that racial considerations predominated in this case over the duty on the part of WCDSS officials to reunite families where possible.

■ The Court also rejects Plaintiffs' argument that Ms. Walker's early 1989 reports noting the racial incongruence of Jeanette's placement with the Tallmans permits an inference of discrimination. She was only noting the facts and reflecting upon the racial

factor set forth in the DSS Manual. As discussed above, even if these reports indicate that racial congruence was a factor on Ms. Walker's mind, such a consideration is permitted by law. If one reads the reports in full, moreover, any hint of racial animus quickly melts away. Ms. Walker is highly complimentary of the care that Plaintiffs provided to Jeanette, and in all the cited reports she recommended Jeanette stay exactly where she was. Thus, Plaintiffs' reliance on these reports to show racial bias is misplaced.

The Court's conclusion that no material question of fact exists regarding whether race was the predominant factor in the decisions leading to Jeanette's return to her mother is further supported by the fact that the Defendants handled the cases of Jeanette and Doris identically. Had race been the predominant factor in placement decisions, there would have been no incentive to remove Doris from her bi-racial foster parents. However, the record indicates that the desire for the two children to grow up together and in their mother's home was the driving force in removing Doris *and* Jeanette from their foster care homes.

Finally, the Court cannot ignore the fact that WCDSS facilitated the Plaintiffs' adoption of two other African–American children prior to the custody battle over Jeanette. While it does not appear that either of the remaining Defendants were involved in aiding these adoptions, this fact demonstrates that the office in which they worked hardly ruled out transracial placements.

Plaintiffs' case would have been stronger had the Defendants placed the girls with their grandparents following the Tallmans' communication of their intent to adopt both children in October, 1990. As noted earlier, the DSS manual indicates that, at least with respect to Jeanette, the Tallmans had a strong claim to keeping custody of her because of the six-year bond between them. However, placement with the Brandons is not what occurred. Rather, they were returned to their mother, who clearly had a superior claim to them once she substantially fulfilled her service plan requirements.

The Court is sympathetic to the plight of Mr. and Mrs. Tallman. As foster parents, they are in the difficult position of being asked to love and nurture children whom they may not be able to keep. However, Plaintiffs have simply failed to create a material issue of fact that race was the predominant factor in the decisions removing Jeanette from their care. As a result, the Court has no choice but to enter judgment against them.

## C. *PLAINTIFFS' CLAIM FOR DAMAGES FOR VIOLATION OF THE MICHIGAN CONSTITUTION MUST FAIL.*

In their response brief, Plaintiffs claim that they have suffered deprivation of their rights under the Michigan Constitution, Art. I, §§ 2 & 17. Those provisions state:

Sec. 2. No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

\* \* \* \* \* \*

Sec. 17. No person shall ... be deprived of life, liberty, or property, without due process of law. The right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed.

Although Plaintiffs also claim that they have suffered a deprivation of due process, it is clear that their suit is one of denial of equal protection on account of race and nothing more. The Court will, therefore, analyze the viability of that claim alone.

It is not yet settled if the Michigan Constitution provides for damages as a remedy for violations of the Michigan Constitution's guarantee of equal protection. Although the Michigan Supreme Court has indicated that damages for violations of the state constitution may in some cases be appropriate, no state decision that this Court is aware of has ever awarded such relief for a breach of the

 

equal protection clause. *See Smith v. Department of Public Health,* 428 Mich. 540, 410 N.W.2d 749, 751 (1987) ("A claim for damages against the state arising from violation by the state of the Michigan Constitution may be recognized in appropriate cases."); *77th District Judge v. State of Michigan,* 175 Mich.App. 681, 438 N.W.2d 333, 339–41 (1989) (declining to award damages as a remedy for violation of equal protection clause in case involving disparate compensation for Michigan district judges).

Fortunately, the Court need not decide the issue of whether a separate damages action is cognizable under the Michigan Constitution's equal protection clause. The parties do not dispute that the same standards of equal protection analysis apply under the Michigan and U.S. Constitutions, and, for the reasons stated above, the Court does not believe that Plaintiffs have come forward with sufficient evidence to avoid summary judgment of their federal claim. Therefore, the Court grants summary judgment on Plaintiffs' state constitutional claim as well.

## D. *PLAINTIFFS' CLAIM FOR DAMAGES FOR GROSS NEGLIGENCE MUST FAIL.*

■ Plaintiffs' claims in negligence also must fail. This Court has previously stated that anti-discrimination rights simply do not exist at common law. *Sherman v. Optical Imaging Sys., Inc.,* 843 F.Supp. 1168, 1181 (E.D.Mich.1994). Rather, they are constitutional and statutory in nature.

As noted above, Plaintiffs originally included a count under Michigan's Elliott–Larsen Civil Rights Act, but later withdrew it. Plaintiffs have also pursued the anti-discrimination rights found in both the U.S. and Michigan Constitutions. Thus, they have sought redress for the alleged discrimination in this case under all of the avenues possibly available to them. This Court will not create a new one by holding that there is now a common law duty not to discriminate.

■ In addition, Plaintiffs concede that Defendants are protected by statutory immunity unless their actions amount to "gross negligence." *See* M.C.L. § 691.1407(2).

Here, there can be no question that Defendants did not act with gross negligence. Defendants were successful in accomplishing the state's preferred objective of returning Jeanette to her natural mother once Ms. Milton was able to care for her. At very most, Ms. Walker and her superiors at WCDSS did not give as much weight to Jeanette's long-term attachment to Plaintiffs in making placement decisions for her as the Department manual may have dictated. Nonetheless, it is clear that indisputably legitimate factors—namely, the goal of placing the two girls in the same home, and, if possible, reuniting them with their natural mother—were the primary considerations behind Defendants' decisions regarding Jeanette. In light of these facts, the Court cannot say that Defendants acted with anything close to gross negligence in handling Jeanette's placement.

## IV. *CONCLUSION*

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' motion for summary judgment is GRANTED. Let Judgment be entered accordingly.