**Michael DERZACK and Karen Derzack, Plaintiffs,**

v.

**COUNTY OF ALLEGHENY, PENNSYLVANIA, County of Allegheny Children and Youth Services, Mary E. Freeland, individually and as Director, County of Allegheny Children and Youth Services, a/k/a Mary E. Garland, Marcia Sturdivant–Anderson, individually and as Regional Director, County of Allegheny Children and Youth Services, Tracey Vorpagel, individually and as a Caseworker for County of Allegheny Children and Youth Services, Daniel Krikston; individually and as Deputy Director, County of Allegheny Children and Youth Services, Suzanne Fagan, individually and as Supervisor, County of Allegheny Children and Youth Services, Mary C. Young, individually and as Manager, Recruitment and Placement Resources Department, County of Allegheny Children and Youth Services, Tom Foester, individually and as Chairman and Commissioner of the County of Allegheny, Pennsylvania, Pete Flaherty, individually and as Commissioner of the County of Alle-**gheny, Pennsylvania, Larry Dunn, individually and as Commissioner of the County of Allegheny, Pennsylvania, East End Cooperative Ministry, d/b/a Sojourner House, Dana Gold, individually and as Director of Sojourner House, Family Services of Western Pennsylvania, Susan Colling, individually and as Director of Foster Care, Family Care Services of Western Pennsylvania, and Jacqueline D. Wilson, individually and as Deputy Director of Foster Care, Family Care Services of Western Pennsylvania, Defendants.**

**Civil Action No. 94–0943.**

United States District Court,
W.D. Pennsylvania.

Nov. 18, 1996.

Arthur Bloom, Margolis Edelstein, Pittsburgh, PA, Alexander H. Lindsay, Jr., Susan S. Jackson, Lindsay, Jackson & Martin, Butler, for plaintiffs.

Nora Barry Fischer, Mark F. Haak, Vincent A. Coppola, Pietragallo, Bosick & Gordon, David James Singley, Timothy W. Pawol, Ira Weiss, John A. Mulroy, Peter J. Taylor, Arthur J. Murphy, Jr., Murphy Taylor, Elizabeth A. Malloy, Joseph F. Quinn, Klett, Lieber, Rooney & Schorling, Jane Ann Thompson, Meyer, Darragh, Buckler, Bebenek & Eck, Joseph K. Williams, III, Byrd R. Brown, W. Kevin Trower, Law Offices of Byrd Brown, Pittsburgh, PA, for defendants.

George E. Yokitis, Mindy J. Shreve, Schnader, Harrison, Segal & Lewis, Pittsburgh, PA, for movant.

## MEMORANDUM OPINION

LEE, District Judge.

**November 18, 1996**

Before the Court is Defendant County of Allegheny's Motion to Dismiss Plaintiffs' Amended Complaint Due to Fraud on the Court (Document No. 230), joined by the other defendants, which alleges that plaintiffs have committed various litigation abuses so egregious as to warrant the extreme remedy of dismissal of their complaint. Magistrate Judge Robert C. Mitchell recommended denial of the motion to dismiss in his Report and Recommendation of December 27, 1995 (Document No. 246), although he found plaintiffs had engaged in a series of deceitful, fraudulent acts undertaken in bad faith. Timely objections to the Report and Recommendation were filed by (i) East End Cooperative Ministry, Sojourner House and Dana Gold (Document No. 247); (ii) Family Services of Western Pennsylvania, Susan Collins and Jacqueline D. Wilson (Document No. 248); (iii) County of Allegheny Children & Youth Services, Mary E. Freeland, a/k/a Mary E. Garland, Marcia Sturdivant–Anderson, Tracey Vorpagel, Daniel Krikston, Suzanne Fagan, and Mary C. Young (Document No. 249); and (iv) County of Allegheny (Document No. 250). Plaintiffs filed no objections.

By order of April 4, 1996, this Court found "that the County of Allegheny has made a substantial preliminary showing that the plaintiffs (i) have committed fraud on the court, and (ii) that dismissal of their amended complaint might be warranted and be the appropriate remedy for such litigation abuses, under all of the circumstances." Order, 3 (Document No. 265). Accordingly, the Court scheduled a hearing and argument on the motion to dismiss to "receive evidence, both testimonial and documentary, on the issues of fraud on the court and appropriate sanctions available as a remedy for such conduct should the Court find plaintiffs have committed such fraud." *Id.* Additionally, the Court directed the parties to submit briefs on available alternative sanctions and as to whether any monetary sanctions which might be im-

posed as an alternative to dismissal of the complaint would be dischargeable in a bankruptcy proceeding.

On July 18, 1996, the Court took evidence and heard testimony and argument.

After consideration of the arguments and the evidence adduced at the hearing, and the entire record before the Court, including the objections to the Magistrate Judge's Report and Recommendation and the parties' memoranda of law in support of and in opposition to dismissal, there is no question plaintiffs Michael and Karen Derzack committed a flagrant "fraud on the court" by manufacturing evidence submitted in answer to interrogatories to support their now-withdrawn business loss claims, namely completely fabricated income tax returns which drastically inflated their business income, and by engaging in other abusive litigation practices. The only serious questions are whether *both* Michael and Karen Derzack are culpable and should share responsibility equally for this fraud on the court and, if so, whether dismissal of their complaint against all defendants is the appropriate sanction. The answer to both questions must be "yes."

### Standards of Review of Magistrate Judge's Report and Recommendation

The Court of Appeals for the Third Circuit has delineated the standards of review by the district court of a magistrate judge's rulings pursuant to referrals under 28 U.S.C. §§ 636(b), in *Haines v. Liggett Group, Inc.,* 975 F.2d 81, 91 (3d Cir.1992). *Haines* states:

The clear and unambiguous language of the statute thus provides for different standards of review when the district court "reconsiders" rulings of the Magistrate Judges in non-dispositive matters under (b)(1)(A) and when it considers "written objections" to "proposed findings and recommendations" of the Magistrate Judge in dispositive matters under (b)(1)(B) and (C). Under (b)(1)(A), the standard of review is circumscribed. The district court is bound by the clearly erroneous rule in findings of facts; the phrase "contrary to law" indicates plenary review as to matters of law. *See also* Rule 72(a), Fed.R.Civ.P. ("Nondis-

positive Matters"). Under (b)(1)(B) and (C), the district court is permitted to make a de novo determination of proposed findings and recommendations, may accept, reject or modify, in whole or in part, the findings and recommendations, and "may also receive further evidence." *See also* Rule 72(b), Fed.R.Civ.P. ("Dispositive Motions and Prisoner Petitions").

*Id.* at 91.

█ A *de novo* determination requires the district court to consider the record that has been developed before a magistrate judge and to make its own determination on the basis of that record, without being bound by his or her findings and conclusions. *Taberer v. Armstrong World Ind., Inc.,* 954 F.2d 888, 904 (3d Cir.1992).

### Findings of Fact

The starting point for our inquiry is the Report and Recommendation of Magistrate Judge Mitchell entered December 27, 1995, in which he made certain findings as to the historical facts reflecting plaintiffs' lack of candor and willingness to win at all costs in this litigation. Notwithstanding his findings of fact, the Magistrate Judge recommended the motion to dismiss be denied because, in his view, plaintiffs' misconduct did not rise to the level of "fraud on the court" inasmuch as plaintiffs had withdrawn their business loss claim and their fraud had occurred in discovery and settlement proceedings outside the presence of the Court.

The Report and Recommendation is a comfortable starting point because defendants did not challenge Magistrate Judge Mitchell's proposed factual findings, nor did plaintiffs file any objections to his Report and Recommendation. Therefore, as plaintiffs stated at the evidentiary hearing before this Court, they are "stuck with" (and legally bound by) the Magistrate Judge's findings of historical fact. Notes of Testimony, ("N.T."), Hearings on Objections, July 18, 1996, at 20. *See e.g., United Steelworkers of America v. New Jersey Zinc. Co., Inc.,* 828 F.2d 1001, 1006 (3d Cir.1987) ("a party's failure to object to a magistrate judge's report and recommendation on a dispositive matter results in

a loss of that party's right to *de novo* review of specific proposed findings under section 636(b)(1)(C); however, the "better practice" is for the district court to provide some *level of review* to dispositive *legal issues* raised by the report.") (emphasis added), *quoting inter alia Henderson v. Carlson,* 812 F.2d 874, 878 (3d Cir.1987); *Jones v. Witinski,* 931 F.Supp. 364, 365 (M.D.Pa.1996) ("In the absence of objections, the court is not statutorily required to review the magistrate judge's report before accepting it (28 U.S.C. § 636(b)(1) and *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985)), although the better practice is for the district judge to afford some level of review to dispositive legal issues raised by the report. *Henderson . . . .*"). Moreover, Magistrate Judge Mitchell's findings of historical fact are amply supported on the record before him, as well as on the additional record developed subsequently before this Court; accordingly, the Court accepts the findings proposed by Magistrate Judge Mitchell which are set forth below, verbatim.

*Magistrate Judge Mitchell's Findings of Fact*

1. The plaintiffs, Michael Derzack and Karen Derzack, commenced this action alleging that Allegheny County and other defendants conspired to prevent them from adopting Byron Jeffrey, a two year old black child, because they are white. The facts surrounding this case are set forth more fully in the Court's Report and Recommendation dated September 27, 1995. That Report and Recommendation (Docket No. 208) was adopted as the opinion of this Court per Order dated November 27, 1995 (Docket No. 229).

2. In its instant motion, Allegheny County argues that the plaintiffs perpetrated fraud on the Court by manipulating financial data upon which they had claimed a business loss and demanded settlement of their lawsuit. Specifically, Allegheny County asserts that the documents the plaintiffs provided it to support their alleged business loss claim, *i.e.,* business tax returns for 1993 and 1994 and personal income tax returns for 1990–1992, are fraudulent, as the plaintiffs in fact filed no business tax returns for 1993 and 1994 and altered copies of the personal income tax returns they filed in 1990–1992.

3. The record shows that at a status conference held on March 7, 1995, [before the Magistrate Judge], the plaintiffs made a formal demand to the defendants for $1,615,000 in order to settle their lawsuit; that included in such demand was a claim for $550,000 in aggregate business loss allegedly suffered as a result of the defendants' actions; that on March 13, 1995, Allegheny County served the plaintiffs with a Request for Production of Documents, seeking disclosure of relevant tax and financial data pertaining to the plaintiffs' business loss claim; that the plaintiffs failed to comply with such request, whereupon Allegheny County moved to compel the plaintiffs to respond to its outstanding Request for Production of Documents and to compel Michael Derzack to appear at a deposition related to the business loss claim; that on May 8, 1995, the Court ordered the plaintiffs to answer Allegheny County's aforementioned Request for Production of Documents and ordered Mr. Derzack to be deposed for purposes of the business loss claim; that instead of complying with the May 8, 1995 Order, the plaintiffs notified opposing counsel by letter dated May 12, 1995 that they were withdrawing their business loss claim; that at the conclusion of Mr. Derzack's deposition, Allegheny County requested the plaintiffs to provide it with a copy of their federal income tax return for 1994, as well as authorization for the Internal Revenue Service to furnish it with copies of plaintiffs' other tax returns; that the plaintiffs failed to comply with these requests, such that in an Order of Court dated September 28, 1995, the plaintiffs were ordered to execute forms to permit the Internal Revenue Service to release copies of their personal and business tax returns for 1990–1994 to Allegheny County; and that notwithstanding this Order of Court, the plaintiffs signed a release pertaining to tax years 1993–1994, but refused to execute a release as to tax years 1990–1992.

4. Consequently, Allegheny County moved for sanctions due to the plaintiffs' failure to authorize the release of their tax returns for 1990–1992. On October 20, 1995, at a hearing held on the motion for sanctions,

the Court ordered the plaintiffs to provide Allegheny County with a signed release pertaining to their personal and business tax returns for 1990–1992. The plaintiffs did provide the aforementioned releases to Allegheny County, and Allegheny County has reviewed the tax returns in question.

5. Clearly, the personal tax returns the plaintiffs filed with the Internal Revenue Service vary from the purported tax returns they provided Allegheny County in support of their $550,000 business loss claim. Specifically, the plaintiffs provided Allegheny County with altered versions of their 1990, 1991 and 1992 personal income tax returns by inflating the wages, adjusted gross income and various tax computations set forth in those actual returns filed with the Internal Revenue Service.

6. In addition, the plaintiffs were directed to pay Allegheny County sanctions in the amount of $1,310.80 due to their non-compliance with the Court's September 28, 1995 Order of Court. The plaintiffs have failed to pay Allegheny County the sanction of $1,310.00, as they recently filed a Chapter 13 bankruptcy petition in the United States Bankruptcy Court for this district.

7. The plaintiffs also provided Allegheny County with altered corporate tax returns for 1991 and 1992 as compared with those actual returns filed with the Internal Revenue Service. As for the plaintiffs' purported corporate tax returns for 1993 and 1994 which were provided to Allegheny County, the Internal Revenue Service confirms that the plaintiffs never filed corporate income tax returns for those years, although Mr. Derzack testified to the contrary.

8. It also appears that Mr. Derzack lied under oath about the location of his printing business. Derzack testified that in 1994, he moved his business and a printing press to 10592 Perry Highway; that friends helped him move there, but he cannot recall their names; and that he began operations there shortly after the move.... Derzack's statements are contradicted by Nick Umbrage, the owner and operator of a Mailboxes, Etc. store located at 10592 Perry Highway. As set forth in his affidavit, Mr. Umbrage avers that he has owned and managed his store at said location since 1989; that Michael Derzack rents a post office box from his store, but has never conducted a printing business at this location; and that Derzack has never maintained any equipment, including, but not limited to, a printing press or printing supplies at this location. (*See,* affidavit of Nick Umbrage, attached as exhibit H to the County Commissioners' joinder brief.) [Mr. Umbrage confirmed the averments in his affidavit at the evidentiary hearing before this Court.]

9. Thus, it is clear that the plaintiffs provided fraudulent documents to Allegheny County to support their original business loss claim, and that the business loss claim of $550,000 was false. It also appears that Mr. Derzack lied under oath during his July 10, 1995 deposition. As a result, Allegheny County seeks to dismiss this action as a sanction against the plaintiffs.

10. It is the plaintiffs' position that there has been no fraud on the Court, as none of the tax returns were filed with the Court, but rather, were only provided to the defendants. The plaintiffs also aver that the tax returns neither prevented the defendants from preparing a defense on the merits of this case, nor adversely affected the Court's ability to fairly adjudicate it.

11. [Magistrate Judge Mitchell] agree[s]. While the record here is replete with instances of stonewalling, bad faith, lack of candor and perhaps questionable dealings on the part of the plaintiffs, we cannot say that they perpetrated fraud on the Court. That is, the plaintiffs' complained-of conduct was not directed to the Court itself, but rather, to the defendants. In addition, the plaintiffs' misconduct will not prevent the defendants from fairly presenting their case and will not interfere with the Court's impartial adjudication of it. Further, the facts surrounding the plaintiffs' tax returns is a collateral issue which has no relationship to the merits of their suit.

Thus, while the plaintiffs' credibility may be called into question by the trier of fact, dismissal of this action based upon the instant motion is unwarranted.

12. The tax returns at issue were provided to the defendants in discovery and were never filed with the Court. Likewise, the plaintiffs' initial demand for damages (which included their business loss claim) was never filed with the Court. Moreover, it appears that production of the altered tax returns did not affect attempts to settle this case, as no written offers of settlement were made until after the plaintiffs withdrew their business loss claim.

*Joint Stipulation*

On July 18, 1996, the parties filed a Joint Stipulation which essentially reaffirmed many of Magistrate Judge Mitchell's findings. Of particular interest are the following verbatim stipulations:

13. **1/12/95**—Pre–Trial Status Conference before Judge Mitchell in which Judge Mitchell instructed Plaintiffs' counsel to provide formal demand at next status conference. [Stipulation No. 1]

14. **3/7/95**—(next status conference)— Plaintiffs' counsel presents Court and all attorneys with formal written demand. Actually hand delivered a courtesy copy to Judge Mitchell by Plaintiffs' counsel while Judge Mitchell is on bench. Demand is for $1,615,-000.00; *$550,000* of which relates to "business losses" due to "conduct of defendants." At this status conference, the Judge orders that all discovery conclude by May 15, 1995. [Stipulation No. 3]

15. **7/10/95**—Deposition of Mr. Derzack. While at said deposition, Mr.

Derzack testifies to authentication of his signature on copy of each corporate and individual tax return as well as that of his wife; that returns were prepared without assistance of an accountant; that returns were filed with IRS; and that no amended returns were filed.

Near the conclusion of his deposition, Mr. Derzack agrees to execute Form 4506 Tax Authorization so as to permit Allegheny County to obtain corporate and individual returns from the federal government. Said authorization is given to Mr. Derzack at his deposition. [Stipulation No. 12]

16. **11/2/95**—County's counsel receives individual tax returns actually filed by Derzacks with IRS for the years 1990 through 1993. [Stipulation No. 24]

17. **11/6/95**—Mr. Derzack, for the second time, signs an authorization for release of corporate tax records, as first corporate authorization was not accepted by IRS. [Stipulation No. 25]

18. **11/8/95**—County's counsel receives corporate tax returns of Commercial Press from IRS for years 1991 and 1992. No corporate tax returns could be located in the Pittsburgh District for years 1993 and 1994. [Stipulation No. 26]

19. The 1990 through 1993 personal and the 1991 and 1992 corporate tax returns included in the Compilation of Exhibits in Support of Allegheny County's Motion to Dismiss (hereinafter "Compilation"), identified in the index thereto as "(per Allegheny County)," are true and accurate copies of the tax returns provided by the Derzacks in the course of discovery in this lawsuit. [Stipulation No. 27]

20. The 1990 through 1993 personal and the 1991 and 1992 corporate tax returns included in the Compilation, identified in the index thereto as "(per IRS)," are true and accurate copies of the tax returns filed by the Derzacks with the IRS. [Stipulation No. 28]

*Defendants' Proposed Findings of Fact Which Are Supported by the Record and Adopted By the Court*

The Court also adopts the following verbatim defendants' proposed findings as the findings of the Court, as they are fully supported by the record and by credible witnesses for the defendants:

21. From the inception of this lawsuit until May 9, 1996 when this Court granted the Motion for Leave to Withdraw Appearance, both Michael and Karen Derzack have been represented by the law firm of Rosenberg, Kirshner, P.C. At no time has any attorney entered a separate appearance for Michael or Karen Derzack. [Defendants' Proposed Finding No. 2]

22, The aforementioned demand purported to itemize the gross sales and total income of

Plaintiffs' business for the years 1989 through 1993. In said demand, Plaintiffs claimed that they had incurred "business losses" for the years 1993 and 1994 in the amount of $550,000 exclusively due to the conduct of the Defendants. (Ex. 1). [Defendants' Proposed Finding No. 6]

23. On May 8, 1995, Magistrate Judge Mitchell ordered Plaintiffs to respond to the aforementioned Request for Production of Documents and further ordered Mr. Derzack to appear at a deposition to testify to issues exclusively relating to Plaintiffs' alleged business loss claim. (Ex. 5; Stipulation, ¶ 7). This Order was received by counsel for the County on May 10, 1995. (Tr. 38) [Defendants' Proposed Finding No. 13]

24. Instead of complying with the May 8, 1995 Order, the Plaintiffs through their counsel, notified opposing counsel by letter dated May 12, 1995 that they were withdrawing their business loss claim. (Ex. 6; Stipulation, ¶ 9; Finding of Fact of U.S. Magistrate Judge Mitchell contained in Report and Recommendation dated December 28, 1996, pps. 4–5). ("J. Mitchell Findings of Fact"). [Defendants' Proposed Finding No. 15]

25. On July 10, 1995, the deposition of Michael Derzack was taken. (Ex. 8). This deposition was taken:

a. Approximately two months following the close of discover;

b. Pursuant to the Order of Judge Mitchell dated May 8, 1995; and

c. For reasons exclusively relating to issues pertaining to potential tax fraud associated with the tax returns provided by Plaintiffs in the course of discovery.

(Exs. 5, 7; Stipulation, ¶¶ 3, 7). [Defendants' Proposed Finding No. 20]

26. At said deposition, Mr. Derzack authenticated each corporate and individual tax return that had been provided by the Derzacks on or about January 12, 1995 in response to the Joint Defense Request for Production of Documents. In connection with said authentication, Mr. Derzack:

a. Verified the authenticity of his signature on each individual tax return;

b. Verified the authenticity of Mrs. Derzack's signature on each individual tax return;

c. Verified that each of the tax returns was filed with the IRS;

d. Verified that each of said returns was prepared without assistance of an accountant; and

e. Verified that in each instance, no amended return was filed.

(Stipulation, ¶ 12) [Defendants' Proposed Finding No. 21]

27. Mrs. Derzack was in attendance during the entirety of the deposition of Mr. Derzack taken on July 10, 1995. (Tr. 133, 140). [Defendants' Proposed Finding No. 22]

28. Near the conclusion of the deposition of Mr. Derzack of July 10, 1995, he agreed to execute IRS Form 4506 Tax Authorizations, so as to permit the County to obtain copies of the corporate tax returns for K & M Marketing Services Corp. d/b/a Commercial Press ("Commercial Press") and individual tax returns of Karen and Michael Derzack for the years 1990 through 1994 that were filed with the IRS. (Stipulation ¶ 12) [Defendants' Proposed Finding No. 23]

29. During the deposition of July 10, 1995, Mr. Derzack testified that in the fall of 1994, he moved the entire business of Commercial Press, including a printing press and various supplies to a facility located at 10592 Perry Highway in Wexford, Pennsylvania. (J. Mitchell findings of Fact p. 7, fn. 16; Tr. 123–126) [Defendants' Proposed Finding No. 24]

30. At no time did Mr. Derzack move the business of Commercial Press, including a printing press and various supplies, from 107 Market Street, Pittsburgh, Pennsylvania to 10592 Perry highway, Wexford, Pennsylvania; rather, on or about September 26, 1994, Mr. Derzack merely opened a post office box at a franchise known as Mailboxes, Etc. at the address of 10592 Perry Highway, Wexford, Pennsylvania on or about September 26, 1994. (J. Mitchell Findings of Fact, p. 7, Tr. 127) [Defendants' Proposed Finding No. 25]

31. Said post office box was opened by Mr. Derzack in the name of Commercial Press and remained opened until approximately December 31, 1995. Said post office box was nothing more than a 6½ inch mailbox used exclusively for receiving mail. (Tr. 128) [Defendants' Proposed Finding No. 26]

32. The corporate and personal income tax returns provided by Plaintiffs' counsel on or about January 12, 1995, in response to the Joint Defense Request for Production of Documents, were identical to the income tax returns provided by the Derzacks to their counsel on or before January 12, 1995. (Tr. 103, 113, 114) [Defendants' Proposed Finding No. 43]

33. The personal tax returns provided by the Derzacks in response to the Joint Defense Request for Production of Documents reflected the following adjusted gross incomes for the following years:

| 1990 | $123,721 | (Ex. 19b Stipulation, ¶ 27) |
| 1991 | $144,226 | (Ex. 21b Stipulation, ¶ 27) |
| 1992 | $182,527 | (Ex. 22b Stipulation, ¶ 27) |
| 1993 | $ 25,061 | (Ex. 23b; Stipulation, ¶ 27) |

[Defendants' Proposed Finding No.44]

34. The personal tax returns of Karen and Michael Derzack received by the County from the IRS on November 2, 1995 reflected the following adjusted gross incomes for the following years:

| 1990· | $23,721 | (Ex. 19a; Stipulation, ¶ 28) |
| 1991 | $24,226 | (Ex. 21a; Stipulation, ¶ 28) |
| 1992 | $29,527 | (Ex. 22a; Stipulation, ¶ 28) |
| 1993 | $25,261 | (Ex. 23a; Stipulation, ¶ 28) |

[Defendants' Proposed Finding No. 45]

35. The corporate tax return pertaining to Commercial Press provided by the Derzacks in response to the Joint Defense Request for Production of Documents for 1991 reflected gross receipts of $299,545; a cost of goods sold of $57,911; and a "compensation of officers" set forth on Line 12 of $135,000. (Ex. 24b; Stipulation, ¶ 27). [Defendants' Proposed Finding No. 46]

36. The corporate tax return of Commercial Press provided by the Derzacks in response to the Joint Defense Request for Production of Documents for 1992 reflected gross receipts of $344,851: a cost of goods sold of $57,742; and a "compensation of officers" of $168,000. (Ex. 25b; Stipulation, ¶ 27) [Defendants' Proposed Finding No. 48]

37. The corporate tax return for Commercial Press for the year 1991 actually filed with the IRS reflected gross receipts of $299,555; a cost of goods sold of $127,911; and "compensation of officers" of $15,000. (Ex. 24a; Stipulation, ¶ 28) [Defendants' Proposed Finding No. 48]

38. The corporate tax return of Commercial Press for the year 1992 actually filed with the IRS reflected gross receipts of $341,295; a cost of goods sold of $177,742; and "compensation of officers" of $15,000. (Ex. 25a; Stipulation, ¶ 28) [Defendants' Proposed Finding No. 49]

39. Michael and Karen Derzack provided Allegheny County with altered versions of their 1990, 1991 and 1992 personal income tax returns by inflating the wages, adjusted gross income and various tax computations set forth in those actual returns filed with the IRS. (J. Mitchell Findings of Fact, p. 6) [Defendants' Proposed *Finding* No. 50]

40. Michael and Karen Derzack also provided Allegheny County with altered corporate tax returns for 1991 and 1992 as compared with those actual returns filed with the IRS. (J. Mitchell Findings of Fact, p. 6) [Defendants' Proposed Finding No. 51]

41. Both Mr. and Mrs. Derzack provided fraudulent documents to Allegheny County to support their business loss claim. (J. Mitchell Findings of Fact, p. 7) [Defendants' Proposed Finding No. 53]

42. The business loss claim contained in the demand letter presented to Judge Mitchell on March 7, 1995 was false. (J. Mitchell Findings of Fact, p. 7) [Defendants' Proposed Finding No. 54]

43. On December 8, 1995, Mr. and Mrs. Derzack filed a voluntary Chapter 13 Bankruptcy Petition in the United States District Court for the Western District of Pennsylvania. (J. Mitchell Findings of Fact, p. 6, fn. 11) [Defendants' Proposed Finding No. 55]

44. Mr. Derzack lied, under oath, at his deposition of July 10, 1995, when he testified that the income tax returns provided in response to the Joint Defense Request for Production of Documents were true and correct copies of the income tax returns provid-

ed to the IRS. [Defendants' Proposed Finding No. 57]

45. In lying about the veracity of the tax returns provided by Plaintiffs in response to the Joint Defense Request for Production of Documents, Mr. Derzack was attempting to prevent the Defendants from discovering the fact that the tax returns produced in discovery differed from the true and accurate tax returns provided by the Derzacks to the IRS. [Defendants' Proposed Finding No. 58]

46. Mr. Derzack lied, under oath, at his deposition of July 10, 1995, when he testified that he moved the business of Commercial Press from 107 Market Street to 10592 Perry Highway. [Defendants' Proposed Finding No. 59]

47. In refusing to sign and return the IRS Form 4506 Tax Authorizations until being sanctioned by U.S. Magistrate Judge Mitchell on October 20, 1995, Mr. Derzack was attempting to prevent the Defendants from discovering the fact that the tax returns produced in discovery differed from the true and accurate tax returns provided by the Derzacks to the IRS. [Defendants' Proposed Finding No. 60]

48. As late as 1990, Mrs. Derzack was employed as a "cost analyst" with the Aluminum Company of America ("ALCOA"). (Ex. 19b). In this capacity, Mrs. Derzack had experience in accounting and bookkeeping. (Tr. 135) [Defendants' Proposed Finding No. 61]

49. At all times relevant hereto, Mrs. Derzack was a fifty percent (50%) shareholder of Commercial Press and the Vice President of same. (Ex. 8, p. 1235; Tr. 141, 143) [Defendants' Proposed Finding No. 62]

50. Karen Derzack filed numerous IRS Form 941 Employer's Quarterly Federal Tax Returns on behalf of Commercial Press. (Ex. 28, 30, 31, 32; Tr. 142–146). Mrs. Derzack was actively involved in the business of Commercial Press and familiar with corporate tax documentation. [Defendants' Proposed Finding No. 63]

51. Karen Derzack signed the 1990, 1991 and 1992 personal income tax returns that were filed with the IRS. (Tr. 148). [Defendants' Proposed Finding No. 64]

52. Said returns contained directly above the signature line, the following language:

"Under penalties of perjury I declare I have examined this return, including accompanying schedules and statements and to the best of my knowledge and belief they are true, correct and complete...."

(Tr. 145, 147) [Defendants' Proposed Finding No. 65]

53. In executing the 1990, 1991 and 1992 personal income tax returns that were filed with the IRS, Mrs. Derzack was aware and had knowledge of the fact that she and her husband, Michael Derzack, were representing to the federal government that they had an adjusted gross income in 1990 of $23,721; in 1991 of $24,226; and in 1992 of $29,527. [Defendants' Proposed Finding No. 66]

54. The discovery responses provided by counsel for Plaintiffs, including the purported tax returns provided in response to the Joint Defense Request for Production of Documents were provided on behalf of both Mr. and Mrs. Derzack. (J. Mitchell Findings of Fact, pps. 6, 7) [Defendants' Proposed Finding No. 67]

55. Both Mr. and Mrs. Derzack consulted with their attorneys in connection with the preparation of the demand letter presented to United States Magistrate Judge Mitchell on March 7, 1995. (Ex. 1; Tr. 117) [Defendants' Proposed Finding No. 68]

56. The figures contained in said demand letter were derived from the tax returns provided by the Derzacks in response to the Joint Defense Request for Production of Documents. (Ex. 1; Tr. 25, 88–90) [Defendants' Proposed Finding No. 69]

57. Mrs. Derzack knew at the time the demand letter was prepared that the $550,-000 business loss claim for the years 1993 and 1994 was false. (J. Mitchell Findings of Fact, pps. 6, 7) [Defendants' Proposed Finding No. 70]

58. Both Mr. and Mrs. Derzack were present on March 7, 1995 when the aforementioned demand letter was presented to Judge Mitchell. (Tr. 103, 177) [Defendants' Proposed Finding No. 71]

59. In attending the deposition of Michael Derzack on July 10, 1995, Mrs. Derzack heard Mr. Derzack testify to the following:

a. The veracity of the tax returns provided in the course of discovery;

b. The fact that the tax returns provided in the course of discover, were actually filed with the IRS;

c. The fact that the tax returns contained a true and correct copy of the signature of both Michael and Karen Derzack; and

d. The fact that in the fall of 1994, Mr. Derzack moved the offices of Commercial Press, then located at 107 Market Street, Pittsburgh, Pennsylvania, to 10592 Perry Highway, Wexford, Pennsylvania.

(Stipulation ¶ 12; Tr. 139–141) [Defendants' Proposed Finding No. 72]

60. At the time Mrs. Derzack heard her husband testify at his deposition of July 10, 1995, Mrs. Derzack was aware that each of the items referenced in the preceding paragraph was false and that, as a result, Mr. Derzack had committed perjury with regard to each of said items. [Defendants' Proposed Finding No. 73]

61. In refusing to sign and return the IRS From 4506 Tax Authorizations until being sanctioned by U.S. Magistrate Judge Mitchell on October 20, 1995, Mrs. Derzack was attempting to prevent the Defendants from discovering the fact that the tax returns produced in discovery differed from the true and accurate tax returns provided by the Derzacks to the IRS. [Defendants' Proposed Finding No. 74]

*Plaintiffs' Proposed Findings of Fact Which Are Supported by the Record and Adopted by the Court*

The Court also adopts the following verbatim proposed findings of the plaintiffs as they are supported by the record:

62. The tax returns at issue were provided to the Defendants in discovery and were never filed with the Court. (Magistrate Mitchell's Report and Recommendation, footnote 17) [Plaintiffs' Proposed Finding No. 1]

63. The Bankruptcy filed by the plaintiffs was dismissed with prejudice, terminated and closed, on September 5, 1996.... As a result of the dismissal of the Plaintiffs' bankruptcy, the Plaintiffs are now liable for all debts as if the Bankruptcy Petition had not been filed [Plaintiffs' Supplemental Proposed Findings Nos. 1 and 2]

*Additional Findings*

64. Plaintiffs do not assert they have paid the $1,310.80 monetary sanction since their bankruptcy petition was dismissed, or that they intend to do so.

65. Michael Derzack testified very briefly at the hearing on July 18th. N.T., Hearing on Objections, 132–33. Called by the County as if on cross-examination, Mr. Derzack testified the tax returns filed with the IRS. and not those earlier given to the County in discovery, were the true and accurate returns. He also testified that Mrs. Derzack was present at most if not all of his depositions, including his deposition of July 10, 1995. *Id.*

66. Based upon careful observation of her demeanor and tone and the content of her testimony, the Court finds Karen Derzack's testimony (particularly, that she knew nothing about the fraudulent tax returns supplied to defendants until she heard about them from a reporter; that she did not remember hearing Michael Derzack testify as to those vastly inflated business loss figures at his deposition and that she did not recall him falsely testifying as to moving his printing business) to be incredible and unworthy of belief. To the contrary, the Court finds Karen Derzack to be a competent businessperson with an impressive financial background and business acumen, who knew of and participated with her husband in foisting the phony business loss claim on the defendants in the first instance, although perhaps not as actively as her husband had. and in attempting to cover it up in the second.

67. The court-ordered proposed findings of fact and conclusions of law were filed on July 29, 1996 (the County's) and August 6, 1996 (plaintiffs'); plaintiffs filed supplemental findings on September 17, 1996. Additionally, the County filed motions to strike certain portions of plaintiffs' proposed and supple-

mental findings, to which responses and replies were filed, the latest (the County's joinder in certain defendants' surreply) being filed on October 25, 1996.

### Discussion and Conclusions of Law

As Magistrate Judge Mitchell summarized, "it is clear that the plaintiffs provided fraudulent documents to Allegheny County to support their original business loss claim, and that the business loss claim of $550,000 was false. It also appears that Mr. Derzack lied under oath during his July 10, 1995 deposition." Report and Recommendation, 7. Moreover, "the record here is replete with instances of stonewalling, bad faith, lack of candor and perhaps questionable dealings on the part of the plaintiffs ... Report and Recommendation, 9." To that summary, the Court adds that *both* plaintiffs participated in the fraud and in the subsequent cover-up, including Karen Derzack's tortured and evasive testimony on July 18, 1996, in an ill-conceived and unbelievable attempt to distance herself from her husband's actions and place all responsibility on him.

Nevertheless, the Magistrate Judge did not believe plaintiff's misconduct merited the ultimate sanction of dismissal because (i) it "was not directed to the Court itself, but rather, to the defendants" by way of plaintiffs' response to discovery requests and settlement demands; (ii) that plaintiffs' misconduct, having been flushed-out, will "not interfere with the Court's impartial adjudication" of the case; and (iii) that the "facts surrounding the plaintiffs' tax returns is a collateral issue which has no relationship to the merits of their suit." Report and Recommendation, 9. This Court respectfully disagrees with Magistrate Judge Mitchell as to the materiality and severity of plaintiffs' abusive litigation tactics, and finds that neither individually nor collectively do these reasons lessen the impact of plaintiffs' fraud on the Court or warrant a reprieve from the heaviest of penalties for tampering with the administration of justice to such an extraordinary degree.

A federal court has the authority to, and must not avoid the responsibility for, monitoring the conduct of all litigants and attorneys who come before it. *Tutu Wells Contamination Lit.*, 162 F.R.D. 46, 62 (D.Vi. 1995), *citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46, 111 S.Ct. 2123, 2132–34, 115 L.Ed.2d 27 (1991). The court's obligation is to protect not only litigants who may suffer from abusive litigation practices of their adversaries, but also to promote the proper function of a fair and effective judicial system which, while it is adversarial, need not also be callous, uncivil, sneaky or booby-trapped. When it becomes so, the courts must act decisively.

The courts derive their authority and obligation to monitor and control the conduct of litigation from many sources, including statutory (*e.g.,* 28 U.S.C. § 1927) and procedural (*e.g.,* Fed.R.Civ.P. 11(c), 16(f), 37(b), 41(b), 55), and various flexible and formidable sanctions have been devised to implement and enforce the rules of engagement. *See e.g., Chambers* (discussing and contrasting several sources of courts' authority and obligations to control various aspects of litigation in federal courts, and the sanctions available and appropriate for each source); *Martin v. Brown*, 63 F.3d 1252, 1264–65 (3d Cir.1995) (same); *Harris v. City of Philadelphia*, 47 F.3d 1311, 1329 (3d Cir.1995) (same). *See generally* J. Solovy, L. Kaster, N. Hirsch, J. Thompson. *Sanctions in Federal Litigation* (Butterworth 1991) (hereinafter *"Sanctions"*). Neither statute nor the Federal Rules of Civil Procedure supplant, however, the implicit, inherent power of the court—perhaps the mother source of the authority and responsibility of the courts to control the conduct of litigation—to restrain excesses of the participants and to preserve the integrity of the judicial process. *Chambers*, 501 U.S. at 46, 111 S.Ct. at 2133–34; *Sanctions*, Chapter 4, Inherent Power of Courts, §§ 4.01–02. The inherent power arises from the very nature of the judicial institution, and is incidental and necessary to the fair and efficient operation of the courts. Thus, the power of the courts to impose silence, decorum, and respect, and to require submission to rules of fair play is "universally acknowledged to be vested" in courts so as to "achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43, 111 S.Ct. at 2132, *quoting Anderson v. Dunn*, 6 Wheat. 204,

227, 5 L.Ed. 242 (1821) *and Link v. Wabash R. Co.*, ·370 U.S. 626, 630–31, 82 S.Ct. 1386, 1388–89, 8 L.Ed.2d 734 (1962).

■ The various statutory and procedural rules of conduct before the court are, generally, tailored to certain categories of participants or aspects of litigation, and are subject to procedural and substantive limitations peculiar to each. *Chambers*, 501 U.S. at 46, 111 S.Ct. at 2133–34. Where misconduct clearly implicates a specific rule, a court should consult and consider it as an avenue of discipline or relief. *Martin*, 63 F.3d at 1264. However, there may be, under given circumstances, substantial overlap amongst the various rules, and the inherent power of the court overlays the entire litigation process and "extends to a full range of litigation abuses." *Chambers*, 501 U.S. at 46, 111 S.Ct. at 2134. Accordingly, the court's inherent power is broad and can be called upon not only to fill-in the interstices between particular rules of conduct, but also may be referred to in addition to said rules, where appropriate. *Id.* at 46, 50, 111 S.Ct. at 2133–34, 2135–36. Nevertheless, the court's inherent power must always be exercised with caution, *id.* at 43, 111 S.Ct. at 2132, and the court must take "care in the use of inherent powers to impose sanctions." *Martin*, 63 F.3d at 1265.

■ Because the Derzacks' fraudulent scheme of manufacturing evidence to support their business loss claim and subsequently covering-up their scheme occurred in the context of court-ordered or court-monitored discovery and settlement discussions, several particular rules of conduct might arguably be implicated, including Fed.R.Civ.P. 37(b) (sanctions for discovery abuses) and Fed. R.Civ.P. 41(b) (dismissal for violation of court orders). Because the Derzacks' misconduct clearly constitutes a "fraud on the court" as that species of litigation abuse has developed, however, and because it occurred throughout several aspects of this litigation which are not squarely covered by any one rule, the Court holds, as have most federal courts faced with similar abuse, that plaintiffs' misconduct most directly implicates the inherent

power of the court to curb such excesses and, just as clearly, warrants invocation of that power to sanction the responsible [1] parties. *See e.g., Chambers*, 501 U.S. at 50–51, 111 S.Ct. at 2135–36 (inherent power of court "reaches both conduct before the court and beyond the court's confines," and may properly be invoked to sanction willful bad-faith conduct committed in an attempt to perpetrate fraud on the court); *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) (foisting an "article" on the court as legitimate, non-partisan authority for party's position, without informing court that article actually was written by lawyers for that party, warranted setting aside a judgment obtained by the use of said article; "tampering with the administration of justice ... involves far more than injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated. ..."); *Weese v. Schukman*, 98 F.3d 542 (10th Cir.1996) ("Generally speaking, only the most egregious misconduct, such as bribery of a judge ... or the fabrication of evidence by a party in which an attorney is implicated will constitute a fraud on the court."), *quoting Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir.1978); *Nichols v. Klein Tools, Inc.*, 949 F.2d 1047 (8th Cir. 1991) (Plaintiff lied *during* deposition testimony that he was wearing defendant's "snap hook" while *working* on a construction project when he fell and was injured, and his fabricated testimony in depositions constituted fraud on the court, and warranted the ultimate penalty of dismissal, particularly where plaintiff's resources appeared to be limited so taxing costs against him would not benefit the defendant); *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, (1st Cir.1989) (Conduct of plaintiff in filing complaint based upon bogus purchase agreement, and in authorizing attachment of that agreement to complaint, constituted fraud on the court warranting dismissal of action, even though plaintiff eventually withdrew the complaint based upon the fraudulent contract and sub-

---

1. There is no suggestion by defendants that plaintiffs' previous or current counsel knew of the Derzacks' deceit or misconduct or were du-

plicitous in any way, nor would the record support such a suggestion. The *only* responsible parties are the Derzacks themselves.

stituted the original, actual contract; fraud on the court "occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense."; *collecting cases* ); *Wyle v. R.J. Reynolds Ind., Inc.,* 709 F.2d 585 (9th Cir. 1983) ("courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice."; repeatedly false testimony and sworn answers to interrogatories on critical issue in case constituted fraud and warranted dismissal of complaint.); *Rybner v. Cannon Design, Inc.,* 1996 WL 470668 (S.D.N.Y.1996) (Phony resume and false testimony during deposition constitutes fraud on the court, which warrants dismissal as a sanction pursuant to the inherent power of the court; *collecting* "fabrication of evidence" cases); *Perna v. Electronic Data Systems Corp.,* 916 F.Supp. 388 (D.N.J.1995) (court dismisses case pursuant to its inherent power because one of plaintiff partners willfully and in bad faith photocopied the contents of his opponent's attorney's briefcase when left in partnership's office, court determines the "appropriate analytical framework lies in the inherent power of the court to punish the perpetration of fraud."; *collecting* "fraud on the court" cases); *Tutu Wells Contamination Lit.,* 162 F.R.D. 46 (D.Vi.1995) ("Both the inherent power of the court and various federal rules of civil procedure empower district court to dismiss claims based upon the failure to disclose or making of false or misleading disclosure during discovery which is willful and undertaken in bad faith"); *Vargas v. Peltz,* 901 F.Supp. 1572 (S.D.Fla.1995) (Pursuant to inherent power of the court, dismissal was warranted by persistent pattern of misconduct by plaintiff and her husband in sexual harassment suit, which constituted fraud on the court, including fabrication of evidence (pair of panties), perjury, and obstruction of discovery process by repeated false deposition testimony; *collecting* "fraud on the court/fabrication of evidence" cases); *Pope v. Federal Express Corp.,* 138 F.R.D. 675 (W.D.Mo.1990), *aff'd in relevant part,* 974 F.2d 982 (8th Cir.1992) (Dismissal warranted under inherent authority of court and rules of civil procedure where plaintiff in sexual harassment lawsuit manufactured evidence by altering documents to create a fraudulent document laden with sexual content); *Eppes v. H.E. Snowden,* 656 F.Supp. 1267 (E.D.Ky.1986) (Backdating letters to support counterclaim against insurance company as to valuation of an insured racehorse constituted fraud on the court which required dismissal as only appropriate remedy; "The remedy must serve as a deterrent to the defendant and all others that might be similarly tempted to manufacture documentary evidence and attempt to cover it up with perjured testimony ... [,] must be sufficient to serve universal notice that this conduct will not be tolerated ... [, and] must go further than a dismissal of the counterclaim, and also include imposition of the cost of the litigation, including attorneys' fees, for the entire action.").

*Dismissal as Sanction*

Clearly, a district court "may dismiss a suit outright in response to litigation abuses." *Republic of the Philippines v. Westinghouse Elec. Corp.,* 43 F.3d 65, 73 n. 10 (3d Cir.1995), citing *Eash v. Riggins Trucking, Inc.,* 757 F.2d 557, 566 (3d Cir. 1985) (en banc). Regardless of the source of authority invoked, in "this circuit, [the Court of Appeals for the Third Circuit has] held that district judges should determine the propriety of punitive dismissals in light of the factors outlined in *Poulis v. State Farm Fire and Casualty Co.,* 747 F.2d 863 (3d Cir. 1984)." *Mindek v. Rigatti,* 964 F.2d 1369, 1373 (3d Cir.1992). *See also Harris,* 47 F.3d at 1329–31 (flagrant discovery abuses might support dismissal of entire suit where *Poulis* standard consulted and satisfied); *Adams v. Trustees of New Jersey Brewery Employees' Pension Trust Fund,* 29 F.3d 863, 870 (3d Cir.1994) (dismissal for failure to prosecute under Fed.R.Civ.P. 41(b) analyzed with reference to *Poulis* factors); *Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 918–19 (3d Cir.1992) ("we apply 'some or all of the

six-part test enunciated in *Poulis* ...' in reviewing sanction orders that deprive a party of the right to proceed with or defend against a claim"; court has power to dismiss claim under the authority of Fed.R.Civ.P. 37 or 55 after consideration of *Poulis* test). The *Poulis* factors are:

> (1) the extent of the party's personal responsibility; (2) the prejudice of the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness, (4) whether the conduct of the party of the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.

*Poulis,* 747 F.2d at 868.

■ Because dismissal deprives a litigant of his or her day in court, it is an extreme sanction which cannot be imposed unless all doubts are resolved in favor of reaching a decision on the merits, *Adams,* 29 F.3d at 870, and only after adequate notice and opportunity to be heard prior to dismissal has been afforded. *Dunbar v. Triangle Lumber & Supply Co.,* 816 F.2d 126, 129 (3d Cir. 1987). Nevertheless, "the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Mindek,* 964 F.2d at 1374, *quoting National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). It is not necessary that each of the *Poulis* factors point toward dismissal before it can be deemed appropriate, so long as the district court carefully considers and weighs the several factors and reasonably exercises his or her discretion in finding the scales tip toward dismissal. *Mindek,* 964 F.2d at 1373. Moreover, "*Poulis* did not supply a magic formula whereby the decision to dismiss or not to dismiss a plaintiff's complaint becomes a mechanical calculation.... Instead, the decision must be made in the context of the district court's extended contact with the litigant." *Mindek,* 964 F.2d at 1373.

■ Where fraud on the court is the underlying misconduct upon which the district court is considering dismissal, a modified *Poulis* analysis provides the most suitable framework, the major modification being that "prejudice" encompasses not only the prejudice to the litigants but also the impact on the judicial system and the threat to the integrity of the courts which cannot command respect if they cannot maintain a level playing field amongst the participants. In *Perna,* the district court for the District of New Jersey did not apply the exact *Poulis* formulation, which it believed to be limited to *per se* violations of direct court orders, but instead adopted a more-specific-to fraud on the court analysis, from decisions of the Courts of Appeals for the Fourth and Ninth Circuits, to arrive at the following dismissal criteria: (i) the existence of certain extraordinary circumstances; (ii) the presence of willfullness, bad faith or fault by the offending party; (iii) the relationship or nexus between the misconduct and the matters in controversy in the case; (iv) "prejudice and the public interest" and (v) the degree of culpability. *Perna v. Electronic Data Systems Corp.,* 916 F.Supp. 388, 398 (D.N.J. 1995). While the district court's approach in *Perna* has much to commend it, this Court believes *Poulis* must be applied in all "punitive dismissals," in the Third Circuit, *Mindek,* 964 F.2d at 1373; *Tutu Wells,* 162 F.R.D. at 73–74, but, because *Poulis* is not a "magic formula," will draw on the *Perna* analysis and the fraud on the court jurisprudence to modify the *Poulis* test somewhat by expanding the "prejudice" criteria beyond the consideration of prejudice only to the particular litigants. Under any of the various standards for considering dismissal for fraud on the court, however, the Derzacks' complaint should be dismissed with prejudice.

*Application of Modified Poulis Criteria*

1. *The Extent of the Party's Personal Responsibility.*

■ There is no question that both *Michael and Karen Derzack* (and *not* any of

their attorneys) bear responsibility not only for the manufactured evidence they submitted to defendants in order to support their business loss claims, but also for their stonewalling and obfuscation in the subsequent cover-up to conceal their misdeeds, including Michael Derzack's conspicuously false testimony at his deposition with Karen Derzack's willful, albeit passive, cooperation and participation. Moreover, plaintiffs' litigation abuses were flagrant, willful, and in bad faith. This factor favors dismissal of the complaint.

2. *Prejudice (a) to the Adversaries, and (b) Impact on Integrity of Judicial System.*

(a) *Prejudice to the adversaries*—At the outset, the Court rejects plaintiffs' "no harm, no foul" argument. Plaintiffs argue that because the Derzacks' fraud was found-out before any real damage had been done to the merits of the case or defendants' ability to prosecute same, and because they "voluntarily" withdrew their business loss claim, there is no lasting prejudice that would justify dismissal. In fact, counsel argued to the Court at the evidentiary hearing on the objections to the Magistrate Judge's Report and Recommendation that "this is a Godsend to the Defendants" because they will now be able to use plaintiffs' schemes and deception against them to impeach their credibility, N.T., Hearing on Objections, 166, 169. "Godsends" like this, litigants and the Court can do without. This Court rejects plaintiffs' clever "spin" on the prejudice issue as pure sophistry.

The type of prejudice that will support dismissal of an action for abuse of litigation tactics need not be irreversible, and can consist of the extra costs of repeated delays in filing of motions necessitated by the improper behavior on the part of plaintiffs. *Curtis T. Bedwell & Sons v. Int'l Fidelity Ins. Co.*, 843 F.2d 683, 693–94 (3d Cir.1988), *Poulis*, 747 F.2d at 868. Although plaintiffs concede that at least some prejudice of this sort has occurred to the adversaries, plaintiffs seem to be arguing that any prejudice is no longer *material* to the ultimate determination of the merits of the case. However, materiality is not a component of the *Poulis*

analysis, "a court may impose sanctions no matter how immaterial the information withheld or how prejudicial the effect of the infraction, but ... the degree of sanctions imposed may vary according to degree of prejudice or severity of the misconduct." *Tutu Wells Contamination Lit.*, 162 F.R.D. 81, 90 (D.Vi.1995) (*Tutu Wells II* ). Materiality "may be considered by a court as part of an inquiry into the actual prejudice suffered by the party" against whom the fraud was perpetrated, but a finding that the fraud was "material" is not a separate prerequisite to the imposition of sanctions. *Id.*

Plaintiffs' argument is predicated primarily on the fact that they "voluntarily" withdrew their business loss claims shortly after their deceit was discovered. Mr. Aoude used a similar tactic in *Aoude v. Mobil Oil Corporation*, 892 F.2d 1115 (1st Cir.1989), where he withdrew his initial complaint which had attached a doctored agreement and attempted to substitute an amended complaint with the actual agreement attached. Rejecting his lack of materiality argument, the circuit court stated:

> The [plaintiff's] bogus agreement clearly had the *capacity to influence the adjudication* and to hinder Mobil's presentation of its case. *The failure of a party's corrupt plan does not immunize the defrauder from the consequences of his misconduct.* When Aoude concocted the agreement, and thereafter, when he and his counsel annexed it to the complaint, they plainly thought it material. That being so, *"[t]hey are in no position now to dispute its effectiveness."*

892 F.2d at 1120 (citations omitted; emphasis added).

While the damage was *contained* when the Derzacks withdrew their business loss claims from this suit, the prejudice to their adversaries did not vanish by the simple expedient of withdrawing a portion of their lawsuit. To the contrary, defendants have had to endure protracted satellite litigation in discovering the extent of plaintiffs' deceit and in pursuing an appropriate remedy for their fraud on the court (with additional substantial investments of time, money and energy) and additional delays In reaching the merits of the case.

Moreover, this Court takes the "voluntary" withdrawal argument with a grain of salt; the "voluntary" withdrawal of the business loss claims occurred only after the handwriting was on the wall and plaintiffs knew they had been caught. The Court seriously doubts whether the business loss claim would have been withdrawn had defendants not been fortunate enough to discover plaintiffs' fraud.

(b) *Impact on Judicial System*—At least of equal, if not greater, importance in the fraud on the court context is the public interest in preserving the integrity of the judicial system. *Perna*, 916 F.Supp. at 397, *citing Aoude*, 892 F.2d at 1119–20. "[U]nscrupulous marauders ... place at risk the very fundament of the judicial system [which] involves far more than injury to a single litigant. It is a *wrong* against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society...." *Perna*, 916 F.Supp. at 397, *quoting Hazel–Atlas*, 322 U.S. at 246, 64 S.Ct. at 1001. As the district court noted in *Perna*, where the fraud was much less calculated and the prejudice much less clear and direct than in this case:

> great prejudice to the litigation process. Our system is built on rules and procedures. Litigants who bring matters before this court must conduct themselves in an appropriate fashion.... Further, there is a public interest in discouraging an "anything goes" approach to litigation. Litigants who avail themselves to the jurisdiction of the court to seek redress must conduct themselves within the orderly administration of justice and the rules of the court.

916 F.Supp. at 401.

The discovery process is an integral part of the judicial process, see Fed.R.Civ.P. 27–37, and in this case it was conducted under the auspices and with the participation of Magistrate Judge Mitchell, as were the settlement negotiations which also are integral to the process. Discovery is not actually *filed with* the Court unless there is a particular dispute as to which certain discovery is relevant, pursuant to the local rules of the

Board of Judge's of the Western District of Pennsylvania. W.D.Pa.L.R. 5.5, Filing of Discovery Materials. Magistrate Judge Mitchell erroneously accepted plaintiffs' argument that their fraud was not really fraud *on the Court* because the fraudulent tax returns had never been filed *with the Court*.

As the court stated in *Perna*: "Although Perna. by his improper conduct did not violate a per se order of this court, the parties were engaging in court-ordered discovery under the authority and jurisdiction of the ... District Court and its rules and procedures....This knowing and intentional improper conduct occurred under this court's supervision and has grossly tainted the litigation process of the court." 916 F.Supp. at 400. Because the inherent power of the court reaches conduct both before the court directly and "beyond the court's confines," *Chambers*, 501 U.S. at 44, 111 S.Ct. at 2132, and because the discovery and settlement processes in this case were certainly within the penumbra of the court's authority and at the hands-on supervision of Magistrate Judge Mitchell, plaintiffs' misconduct adversely impacts on the judicial system and moves the *Poulis* analysis in the direction of dismissal.

### 3. *A History of Deleteriousness and Abuse.*

As previously recited, plaintiffs have engaged in a pattern and practice of "stonewalling, bad faith and lack of candor," not to mention stalling tactics and obfuscation of the fraudulent tax return issue in an attempt to forestall their day of reckoning, as well as false deposition testimony. The cover-up continued at the hearing before this Court with Mrs. Derzack's evasive and unbelievable testimony. This factor favors dismissal.

### 4. *Willfulness or Bad Faith..*

It is hard to imagine a more willful act of fraud on the court than the deliberate, elaborate scheme concocted by the plaintiffs to artificially inflate their financial picture and advance their position in settlement negotiations. It is impossible to imagine how this scheme could not have been conducted in bad

faith. This factor indicates dismissal as the appropriate remedy.

### 5. *Alternative Sanctions.*

This Court has contemplated various alternative sanctions that it might impose on the Derzacks. Monetary sanctions simply are not effective, as we have seen. The monetary sanctions imposed by Magistrate Judge Mitchell on October 20, 1995, in the amount of $1,310.80 remains unpaid to this day, even though the bankruptcy petition filed shortly after that sanction was imposed has now recently been dismissed by the Bankruptcy Court. Plaintiffs' inability or unwillingness to pay a monetary sanction clearly renders it ineffectual. *See Mindek,* 964 F.2d at 1375 ("The district court chose not to impose monetary sanctions against the Mindeks, apparently because the Magistrate Judge had deemed such sanctions inappropriate in light of the Mindeks' in forma pauperis status. This decision not to impose monetary sanctions, like the decision to dismiss the Mindeks' complaint, falls squarely within the district court's discretion and, once again, requires our deference."); *Andrews v. Government of Virgin Islands,* 132 F.R.D. 405, 413 (D.Vi.1990) ("Given the trouble it took to enforce a [previous] sanction of $2,000, and the likelihood that future abuses can be expected, the Court is unwilling to test plaintiffs' inclination to pay a much greater sum."; monetary sanctions are unlikely deterrents to plaintiffs' unwillingness to comply with future court orders).

Moreover, in the fraud on the court context, at least that which rises to the extreme level that we see in this case, monetary sanctions may be inherently inadequate to remedy the harm to the public interest in preserving the integrity of the courts, and in deterring future misconduct on the part of other litigants. *E.g., Tutu Wells,* 162 F.R.D. at 78 ("Respondents' strategy of litigation not only unduly burden the opposition and increased exponentially the litigation costs and time in this case, but resulted in a gross waste of judicial resources. Monetary sanctions alone will not suffice to vindicate the court's authority and compensate the aggrieved parties for the prejudice suffered.");

*Perna,* 916 F.Supp. at 400 ("The assessment of costs and fees alone would be conveying a message to litigants that money could cure one's improper acts.").

The Court has carefully considered other possible sanctions such as an adverse inference instruction to the jury regarding Mr. and Mrs. Derzacks' lack of credibility because of their fraudulent tax return scheme and subsequent cover-up, but finds, as did the court in *Perna,* that such a jury instruction would be inadequate and not proportionate to the severity of plaintiffs' improper conduct.

### 6. *Meritoriousness of the Claims and Defenses*

■ The Court does not use summary judgment standards in determining the meritoriousness of claims or defenses; rather, the claim or defense is deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery by plaintiff or would constitute a complete defense. *Poulis,* 747 F.2d at 869–70.

The Court quite agrees with plaintiffs that the "merits of this case concern not just the Derzacks or Byron Jeffries, but important issues facing our society, namely, whether placement decisions concerning these children can be made on the basis of race." Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ¶ 79. However, although plaintiffs' complaint sets forth a colorable claim, defendants have colorable factual and legal defenses, including whether the plaintiffs were fit adoptive parents. Accordingly, consideration of the meritoriousness of plaintiffs' claims and defendants' defenses is a "wash"; that is, the merits of this case, for purposes of determining whether dismissal is appropriate, are neutral. *Hoxworth v. Blinder, Robinson & Co., Inc.,* 980 F.2d at 922.

### *Balancing Poulis Factors*

The final step in the *Poulis* analysis is to weigh all of the above factors "in order to assure that the 'extreme end' sanction of dismissal or default is reserved for the instances in which it is justly merited." *Poulis,* 747 F.2d at 870. This case presents ex-

tremely important, compelling and sensitive legal and factual issues of constitutional dimension, involving personal and familial relationships implicating societal interests in one of the, if not the, most complicated, multidimensional and intractable problems facing society today—race matters and the vastly disparate perceptions of such matters between the races. *See generally Race Matters,* West, Cornel (Beacon Press 1993). *See specifically,* in the adoption/placement context, *In re: Davis,* 502 Pa. 110, 125–32, 465 A.2d 614, 621–25 (1983)(collecting authority)(although it must not be elevated above all others, race is a factor which, under state law, court must consider in the best interests of a biracial child in an adoption proceeding between his maternal, white grandparents and African–American foster parents); *Tallman v. Tabor,* 859 F.Supp. 1078, 1085–86 (E.D.Mich.1994) (collecting cases)(race of African–American child and Caucasian adoptive parents is a constitutionally permissible factor in placement decision so long as it is not elevated above all others).

The importance and sensitivity of this issue is illustrated by the substantial attention it has attracted in the local and national media. *FOCUS v. Allegheny County Court of Common Pleas,* 75 F.3d 834, 837 (3d Cir. 1996) (citizen's group challenges court's gag orders in these "Baby Byron" adoption proceedings). This Court is well aware of the preference in the Third Circuit for deciding a case on its merits, an inclination this Court fully shares and attempts to achieve in all *cases* coming before it. That preference is, if anything, *heightened* in a case such as *Derzack v. County of Allegheny* which involves emotionally charged personal and societal issues and which generates substantial local and national interest.

Regardless of the importance of the underlying merits of the case, or the public interest in the case, this Court simply cannot shirk its obligation and responsibility to the Derzacks' opponents in this litigation or to the judicial system as an institution which must preserve its integrity in order to continue to fully and fairly preside over the claims of all litigants who come before it. Without the power to pass legislation and with no

armies to enforce its orders, it is only by insisting on professionalism and honesty from the bar and litigants who come before it (and from within, of course), and sanctioning those who willfully and fragrantly violate the courts' orders and rules, that the institution of the judiciary may maintain respect and effectively perform its role as one of the three co-equal branches. Thus this Court must protect the institution from those who would seek justice within its halls while, simultaneously, obstructing justice to their adversaries through abusive litigation tactics such as those employed by the Derzacks'.

When Michael and Karen Derzack initially embarked on their crusade, it may well have been undertaken not only on behalf of Baby Byron and themselves but also to champion the cause of racial equality and race neutral placement decisions. Somewhere along the way, their priorities shifted toward their own undeserved financial gain. Seeing a chance to use this litigation as a means to reap a financial windfall, the Derzacks planned and perpetrated an elaborate fraud on the court so egregious as to prevent this Court, unfortunately, from resolving the important issues presented, and in so doing, plaintiffs have lost the opportunity to carry the banner of racial equality in this Court.

This Court has carefully reviewed numerous fraud on the court dismissals in the federal courts, including those listed above. Each case is unique, but to the extent they may usefully be compared, few (if any) have equaled the level of fraud on the court displayed herein. Under all of the circumstances, the Court finds there is no available alternative sanction that would be adequate or effective to remedy the harm caused by the Derzacks' conduct in this litigation and to deter similar abusive litigation tactics on the part of these and other litigants who will come before this Court.

*Defenses to Dismissal*

Plaintiffs argue defendants "do not come before this Court with clean hands." because "defendants, or counsel for one of the defendants, released the income tax returns of the plaintiffs ... to ... the Pittsburgh Post–Gazette for publication in the media," and also attempted to use medical and employ-

ment information *regarding* Mrs. Derzack in the state court proceedings in violation of "the Federal Court's Order." Plaintiffs' Proposed Findings of Fact, 14, ¶¶ 55, 58. The "Federal Court's Order" plaintiffs reference actually are several orders entered by Magistrate Judge Mitchell during discovery proceedings imposing confidentiality on the use of certain discover, materials outside of the federal court proceedings. N.T., Hearing on Objections. 105–07. Plaintiffs' Exhibits B, C and D. These confidentiality orders are specific to Mrs. Derzack's medical and employment records and do not encompass other discovery, such as the fraudulent and actual tax returns.

Although plaintiffs argued at the hearing before this Court that defendants were responsible for the "leaked" tax returns and that this leak. coupled with the breach of confidentiality regarding Mrs. Derzack's medical and employment records. was an "outrageous" abusive litigation practice, they offer *no authority* to support their argument that such allegedly abusive tactics somehow cancels-out or minimizes the impact of their elaborate fraud on the court. The Court has no doubt that the "clean hands" defense could play a role in a court's calculation of the *Poulis* factors in an appropriate case, but this is not such a case.

In the first place, plaintiffs' tax returns were not subject to any confidentiality order that has been brought to this Court's attention. Second, the "leak" (if any) occurred in November 1995, yet plaintiffs did not complain of it until July 18, 1996, when new counsel for the Derzacks brought it to the Court's attention. Third, plaintiffs have never sought sanctions under Fed.R.Civ.P. 37(b) for defendants' alleged breach of confidentiality orders, nor did they raise a "clean hands" defense in the proceedings before the Magistrate Judge on the motion to dismiss or in objections to his Report and Recommendation. Finally, assuming defendants did violate "Federal Court's Order" regarding improper use of discovery material, any such "violation" pales in comparison to plaintiffs' fraudulent business loss scheme and subsequent cover-up.

Thus, to the extent plaintiffs offer defendants' lack of clean hands as a defense to dismissal, they have not proven defendants' engaged in misconduct that would give this Court pause in its determination of whether to dismiss plaintiffs' complaint.

*Motion for Leave to File Third Amended Complaint*

Also on July 18, 1996, plaintiffs filed a Motion for Leave to File Third Amended Complaint (Document No. 292), stating they "wish to file a Third Amended Complaint adding their minor children . . . as plaintiffs." ¶ 1. Plaintiffs' motion and attached "Third Amended Complaint" purport to assert "civil rights" of the minor children in their own right because they resided in the same household as Byron as part of the family unit and were present on the night of December 27, 1993, when Byron was removed from the Derzack home. After studying the third amended complaint (which actually is the *second* amended complaint), plaintiffs' motion and defendants' various responses thereto, the motion for leave to amend the complaint at the eleventh-plus hour will be denied. This tactic is a transparent and desperate attempt to buoy a sinking, ship by adding dubious claims asserted on behalf of their children without even a *hint* of a justification for the inordinate delay in attempting to add three new parties even though those parties and their interests had been known from day one. Moreover the motion to amend was filed long after discovery had closed, summary judgment motions had been filed and disposed of, and protracted proceedings on the motion to dismiss for fraud on the court had proceeded as far as the hearing before this Court on objections to the Magistrate Judge's Report and Recommendation.

In light of the plaintiffs' undue and unexplained delay, their obvious bad faith in filing the motion on the day of the hearing on said objections. the undue prejudice to the opposing parties that would accompany the addition of new parties (*e.g.*, additional discovery, motions dates, etc.), and the futility of amendment (as evidenced by plaintiffs' failure to offer any legal support for the novel "civil rights" claims asserted on behalf of their minor children), this Court must

420

deny leave to amend the complaint to add new parties. *See e.g., Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (although leave to amend complaint should be freely granted and delay alone is not sufficient reason to deny leave, denial of leave to amend is appropriate where there has been "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, [and] futility of amendment."); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1278 (3d Cir.1994); *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1413–14 (3d Cir.1993), *quoting Foman; Bechtel v. Robinson,* 886 F.2d 644, 652–53 (3d Cir.1989) (absent undue or substantial prejudice to opponent, "denial [can] be grounded in bad faith or dilatory motive, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment"); *Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir.1996) (where plaintiffs "seek amendment solely to avert imminent defeat" after summary judgment motions have been filed, court may consider the "substantial merit/substantial and convincing evidence standard" applied in, *inter alia, Carey v. Beans,* 500 F.Supp. 580, 582 (E.D.Pa.1980), *aff'd,* 659 F.2d 1065 (3d Cir.1981)) (where party seeks to amend after summary judgment motions have been filed, party must show substantial merit to proposed amendments and support same with substantial and convincing evidence).

■ In determining whether an amendment is prejudicial to the opposing party, the court should consider the following: (i) the good faith of the parties seeking the amendment; (ii) the extent to which there has been an undue delay in proffering the amendment; and (iii) the degree to which amendment of the pleadings would needlessly delay the final disposition of the case. *L.D. Schreiber Cheese Co., Inc. v. Clearfield Cheese Co., Inc.,* 495 F.Supp. 313, 316 (W.D.Pa.1980). Delays similar to that of plaintiffs in moving to amend their complaint have been held by other courts as unduly prejudicial. *Mercantile Trust Co. Nat. Ass'n. v. Inland Marine Products Corp.,* 542 F.2d 1010 (8th Cir.1976)

(one year); *Izaak Walton League of America v. St. Clair,* 497 F.2d 849 (8th Cir.), *cert. denied,* 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284 (1974) (17 months); *PSG Co. v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 417 F.2d 659 (9th Cir.1969) (19 months).

Moreover, the delay and disruption of trial proceedings and the prejudice caused by defendants' inability to conduct the requisite additional discovery should the amendment be allowed, itself militates against the allowance of the proposed amendment. *Berger v. Edgewater Steel Co.,* 911 F.2d 911, 924 (3d Cir.1990) (District court did not abuse its discretion in denying employee's motion for leave to amend complaint where amendment would have injected new issues into the case requiring extensive discovery and where motion not only came four and one-half months after information on which it was based became available, but also after a close of extended discovery) *Executive Leasing Corp. v. Banco Popular de Puerto Rico,* 48 F.3d 66, 71 (1st Cir.1995) (motion to amend discovery which would prolong discovery denied), *cert denied* —— U.S. ——, 116 S.Ct. 171, 133 L.Ed.2d 112 (1995); *Johnson v. Methodist Medical Center of Illinois,* 10 F.3d 1300, 1304 (7th Cir.1993) (Where proposed amendment would require opposing party to engage in substantial additional discovery, opposing party would be prejudiced and the court correctly denied motion to amend), *cert. denied* 511 U.S. 1107, 114 S.Ct. 2102, 128 L.Ed.2d 664 (1994), *Little v. Liquid Air Corp.,* 952 F.2d 841, 846 (5th Cir.1992) ("[a]n amendment that a party raised late in the pre-trial life of a lawsuit has a significant tendency to disrupt trial proceedings," and motion to amend properly denied where movants failed to satisfy burden and offered no evidence that their delay in filing motion was excusable as a result of mere oversight), *aff'd.* 37 F.3d 1069, 1073 n. 8 (5th Cir.1994) (*per curiam*) (*en banc*).

*Defendant County of Allegheny's Motion to Strike*

Given the Court's determination on the County of Allegheny's motion to dismiss, its Motion to Strike (Document No. 303) portions of Plaintiffs' Proposed Findings of Fact

and Conclusions of Law, and its Motion to Strike (Document No. 307), Plaintiffs' Supplemental Proposed Findings of Fact and Conclusions of Law are moot.

*Conclusion*

For the foregoing reason, the Court will grant the defendants' motions to dismiss the complaint, and will enter an appropriate order.

### ORDER OF COURT

AND NOW, this 18th day of November, 1996, it is hereby

**ORDERED** that defendant, County of Allegheny's Motion to Dismiss (Document No. 230) is **GRANTED**, and this complaint is **DISMISSED WITH PREJUDICE;**

**IT IS FURTHER ORDERED** that plaintiffs' Motion for Leave to File Third Amended Complaint (Document No. 292) is **DENIED;**

**THIS CASE IS DIMISSED WITH PREJUDICE.**