**ALVIN BATTISTE, JR., Plaintiff**

v.

**VIRGIN ISLANDS TELEPHONE CORPORATION, Defendant**

Civil No. 285/2000

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

August 3, 2006

VINCENT COLIANNI, ESQ., ELIZABETH KLIESCH, ESQ., Colianni & Colianni, St. Croix, U.S.V.I., *Attorney for Plaintiff.*

WILFREDO GEIGEL, ESQ., St. Croix, U.S.V.I., *Attorney for Defendant.*

KENDALL, *Judge*

## MEMORANDUM OPINION

### (August 3, 2006)

THIS MATTER is before the Court on "Plaintiff Alvin Battiste's Motion for the Sanction of Default Judgment." In support of the Motion, Plaintiff alleges willful and gross discovery abuses by Defendant, including withholding and concealing documents as well as the commission of fraud upon the Court. A hearing was held on the Motion, at the conclusion of which, after considering the testimony of the witnesses, the exhibits, and the record, the Court, based upon the reasons set forth below, granted Plaintiff's Motion and entered judgment by default against Defendant on the issue of liability.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On or about September 27, 1998, Plaintiff, an employee of the Virgin Islands Water and Power Authority (WAPA), suffered electrical burn injuries while replacing a de-energized wire on a broken utility pole which was shared by WAPA and Defendant, Virgin Islands Telephone Corporation (VITELCO), pursuant to a Joint Use Agreement. Plaintiff brought this personal injury action in May 2000 against VITELCO which he alleged owned the broken pole. Plaintiff alleged that VITELCO was negligent in maintaining the broken pole and breached its duty of care by placing exceedingly heavy cables thereon which contributed to the break. Plaintiff alleged that the pole broke and fell to the ground during Hurricane Georges which hit the Territory in September 1998.

In his deposition, Mr. Vincent Maynard, WAPA's Line Superintendent, testified that the broken pole was owned by VITELCO and because of VITELCO's delay in replacing it after the Hurricane, WAPA replaced the pole in order to provide electricity to the Federal Emergency Management Agency (FEMA). Plaintiff was assigned by WAPA to assist in removing a de-energized wire from the broken pole and placing it on the replaced pole. After picking up the de-energized wire, it came in

4

contact with an energized wire on another pole a short distance away and Plaintiff received an electrical shock which resulted in injuries to his body.

In his report dated September 26, 2002, Plaintiff's expert witness, Mr. Roger Bybee, P.E., Consulting Electrical Engineer, stated:

7.    On September 27, 1998 Dennis Conner (WAPA Lineman) and Alvin Battiste, Jr. (WAPA Lineman Apprentice) were directed to transfer the Deenergized 7,620/13,200 volt electrical lines from the ground unto the new 050 pole. Mr. Conner was in the bucket of a line truck and Mr. Battiste was on the ground handing one of the conductors to Mr. Conner. During the transfer process between Mr. Battiste and Mr. Conner, Pole No. 37-0071-049 along with the crossarm on the pole shifted causing the conductor being handled to contact one of the dock power conductors at the Dax Pole 2 Spans to the North of pole 050. Mr. Battiste received a severe 7,620 volt electrical shock, burns and injuries, whereas Mr. Conner, in the insulated bucket, was not injured.

8.    As noted in paragraph 5.A above, if VITELCO had supplied the correct length of pole as required by the 1959 Joint Use Agreement or the 1998 Interim Agreement, Mr. Battiste would not have been injured on September 27, 1998.

In its Answer, Defendant denied, *inter alia,* that it owned the broken pole and generally denied that it was liable for Plaintiff's injuries.

## A. Discovery Background Leading to the Hearing

On or about July 17, 2001, Plaintiff served VITELCO with "Plaintiff's Request for Production of Documents to Virgin Islands Telephone Corporation." Several of the requests pertained to documents relative to ownership of the poles in the location where Plaintiff sustained his injuries. Specifically, Request No. 4 sought the following:

All documents between WAPA and Vitelco and or including any other party relating to ownership, leasing or use of poles carrying power or telephone or cable lines in the vicinity of Feeder 5 between the WAPA Krum Bay plant, oil dock and FEMA Building on St. Thomas.

5

On September 4, 2001, Defendant served on Plaintiff its "Response to Plaintiff's Request for Production of Documents," and in response to Request No. 4 stated that "[t]his will be supplemented."

On April 18, 2002, pursuant to Rule 30(b)(6) of the FED. R. CIV. P., Plaintiff deposed Mr. Dennis Chance, Defendant's Network Planning Manager. (*See* Dep. Dennis Chance at 4:9-10, Apr. 18, 2002.) A critical issue during the deposition was the ownership of the poles in the location where Plaintiff sustained his injuries. VITELCO had produced some maps which identified the owners of some of the poles. However, when asked to produce any and all other documents detailing pole ownership, Mr. Chance responded that no other records existed.[1]

Discovery was ordered closed on July 8, 2005.[2] On Friday, June 23, 2006, three (3) days before trial and almost a year after discovery was ordered closed, Defendant served Plaintiff by mail a "Supplemental Notice of Filing of Exhibits" in which was included a document entitled "VITELCO Pole Inventory Sheet." Counsel for Defendant stated that he only received the document from his client on June 19, 2006 and expeditiously mailed it to the Plaintiff on June 21, 2006. The document, which Defendant intended to introduce at trial, purported to identify the owner of the utility poles in the location where Plaintiff was injured.

The "VITELCO Pole Inventory Sheet" was jointly prepared on March 18, 1999, by Ms. Lisa Harris, Engineer Technician employed by WAPA, and Mr. Glen Samuel, an engineer employed by VITELCO. On Row Eleven (11) of the sheet, the owner of pole # 37/071/050 or Pole 050 is listed as WAPA. On Row Twelve (12) of the sheet, the owner of another key pole in this action, pole # 37/071/049 or Pole 049 is also listed as WAPA. VITELCO represented to the Court that Mr. Dennis Chance would testify that Poles 049 and 050 were not owned by VITELCO, but by WAPA.[3]

---

[1] Q: Okay. And these are the only records you know of that are in existence that would determine ownership of the poles?
A: Yes, as far as I can recall. (Dep. Chance at 29: 3-6.)
[2] This date was ordered by the previously assigned Judge. The matter was originally scheduled for Trial on July 25, 2005. For unexplained reasons, it was continued *sine die* by Order dated June 29, 2005 and later reassigned to the undersigned who set Trial for June 26, 2006.
[3] Mr. Chance was present at the hearing but did not testify.

Upon receiving this document and after contacting Ms. Harris to verify its existence, Plaintiff learned that the document did not accurately reflect ownership of the poles as there was a revised document reflecting that the 35 foot, class 4 poles, including Pole 049, were owned by VITELCO. (*See* Harris Aff., June 25, 2006, ¶ 9.)[4]

Plaintiff then filed the instant "Motion for Sanction of Default Judgment" on June 26, 2006, the day of Trial. The undersigned received the Motion in Chambers while meeting with Counsel before Jury Selection. The Court, though reluctant to entertain such late filings, briefly heard argument from the parties. Subsequently, the Court further reviewed the Motion and *sua sponte* held an evidentiary hearing following jury selection to determine whether Defendant's discovery abuses, if any, warranted the sanction of default judgment on the issue of liability.

## B. The Evidentiary Hearing

The Court heard testimony from Ms. Lisa Harris and Mr. Glen Samuel, the authors of the "VITELCO Pole Inventory Sheet" which was admitted into evidence as Plaintiff's Exhibit No. 4.

Ms. Harris testified that "VITELCO's Pole Inventory Sheet," could not be relied upon as being accurate because it was not the final version of the Inventory. She testified that Pole 049 was listed as owned by WAPA because when she and Mr. Samuel were in the field at the Gramakola location, they were unsure which poles belonged to whom. She later inquired of WAPA's Line Attendant Supervisor as to the ownership of the poles and he informed her that all the thirty-five (35) foot, class 4 (35-4) poles were owned by VITELCO. Pole 049 was a 35-4 pole. Ms. Harris testified that the revised version of the Pole Inventory reflected the correction. Ms. Harris further testified that she gave the revised document, showing that VITELCO owned Pole 049 to her then supervisor, Mr. Randolph Harley, who is now deceased. She has since assumed another position within WAPA, and does not know the whereabouts of the revised document. Ms. Harris further testified that both she and Mr. Samuel signed the revised document and Mr. Samuel

---

[4]   In the "VITELCO's Pole Inventory Sheet," poles 48 through 53 except for pole 50 are listed as thirty-five (35) foot, class 4 poles. Pole 50 is listed as a forty-five (45) foot class 2 pole. The significance of this is that pole 50 as listed replaced the broken pole in issue.

7

took the document to copy it because WAPA's copier machine was inoperable at the time.

On cross-examination, Ms. Harris testified that she was able to recall the error so clearly because the area where the poles were located had distinctive problems which stood out in her memory. She also stated that the corrections were made toward the end of the project, so they are fresber in her mind. Defendant also introduced a one-page document into evidence, (Def. Ex. No. 1.) signed by Ms. Harris and Mr. Samuel on December 17, 2003. The document purported to show that four years later, the Inventory still reflected that Pole 049 was owned by WAPA and not VITELCO. Though Ms. Harris recognized her signature and the document as part of the overall inventory project, she stated the handwriting on the document was not hers. She also testified that without the entire document she could not state with any certainty whether the information contained on the document was accurate.

Defendant's witness, Mr. Glen Samuel, testified that the "VITELCO Pole Inventory Sheet", contained accurate and true information. He denied that any corrections were ever made to the document with respect to ownership of the poles. Mr. Samuel also testified that Defendant's Exhibit No. 1 was in his handwriting, that it corresponded to Defendant's Pole Inventory Sheet and that the information was also accurate.

## II. DISCUSSION

### A. The Court's Authority.

Courts have inherent power to impose sanctions on litigants and attorneys appearing before it for bad-faith conduct. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 43, 111 S. Ct. 2123, 2133, 115 L. Ed. 2d 27 (1991). "With the Court's authority comes the inherent power to impose sanctions against members of its Bar and against party litigants, both to 'vindicat[e] its judicial authority and to mak[e] the prevailing party whole for expenses caused by an opponent's obstinacy' or misconduct." *In re Tutu Wells Contamination Litigation*, 162 F.R.D. 46, 62 (D.V.I. 1995) (*In re Tutu Wells I*) quoting *Chambers, supra*, at 45-46, 111 S. Ct. at 2133.

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers, supra* at 44, 111 S. Ct. at 2132. These powers are strongest when fraud is upon the court. *See also, North*

8

*American Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986) ("The sanctions of dismissal or default, however, are generally reserved for those extreme circumstances where deception is willful, in bad faith or relates to matters in controversy that interfere with rightful decisions of a case." (internal citations omitted)).

In addition to its inherent power, the Court also has authority to impose sanctions pursuant to Rule 37 of the FED. R. CIV. P. This Rule "gives the court broad authority to impose any of a wide range of sanctions for discovery abuses." *In Re Tutu Wells I*, 162 F.R.D. at 63. Subsection (c)(1) of the Rule provides that:

> A party that <u>without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1)</u>, or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless *such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.* <u>In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.</u> In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, <u>these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C)</u> and may include informing the jury of the failure to make the disclosure. (emphasis added).

Among the sanctions provided for in Rule 37(b)(2)(C) is "An order ... <u>rendering a judgment by default against the disobedient party</u>[.]" (emphasis added.)

■ "[O]nce culpable conduct is found the court is required to impose such sanctions that are just, both, 'to penalize' the wrongful conduct and 'to deter those who might be tempted to such conduct in the absence of a deterrent.'" *In re Tutu Wells I*, 162 F.R.D. at 63, quoting *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S. Ct. 2778, 2781, 49 L. Ed. 2d 747 (1976). The Court "is not constrained to impose the least onerous sanction available, but may exercise its discretion to choose the most appropriate sanction under the circumstances." *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1022 (8th Cir. 1999).

9

## B. The Court's Findings and Conclusions

A critical issue in this case is ownership of two utility poles-Poles 049 and 050 at the time of the accident. VITELCO has maintained that WAPA, rather than itself, owned those two poles. Both VITELCO and WAPA are parties to a 1959 and 1998 Joint Use Agreement and interim Agreement respectively, regarding utility poles. The Agreements govern, *inter alia,* the responsibilities and liabilities of the utilities with respect to the poles they jointly or separately own. For the poles owned solely by VITELCO, a non-delegable responsibility is ascribed to VITELCO to ensure they were suitable for both VITELCO's and WAPA's use in terms of their strength and size requirements. Thus, ownership of the poles in question is central to establishing liability in this case since, as Plaintiff contends, but for the broken pole, he would not have been assigned to relocate the de-energized wire to the replaced pole, which resulted in his injuries.

As noted heretofore, Plaintiff attempted to obtain documents from VITELCO pertaining to ownership of the poles in question since serving his first "Request for the Production of Documents" in July 2001. Between September 2001, when VITELCO stated it would supplement the request, and June 23, 2006, when the supplement was finally received, the parties deposed several witnesses regarding ownership of the poles. With the exception of Mr. Dennis Chance, all testified that VITELCO owned Poles 049 and 050 at the time of the accident.

Plaintiff's expert witness, Professional Engineer, Mr. Roger Bybee, using drawings of the area, testified that Poles 049 and 050 were owned by VITELCO during the relevant time period.[5] (Bybee Dep. at 8: 2-3, June 8, 2005). Pole 050, originally a thirty-five (35) foot, class 4 (35-4) pole, was owned by VITELCO but was broken during Hurricane Georges. One of the reasons Plaintiff was present at Krum Bay on September 27, 1998 was to replace VITELCO's downed pole, which was replaced that day by WAPA with a 45 foot, class 2 (45-2) pole. VITELCO had not yet begun repairs in the area and WAPA needed to get power to energize FEMA. (*Id.* at 14: 13-14; Maynard Dep. I at 26:1-9, July 23, 2002.) Thus, after WAPA planted its own pole, the "VITELCO Pole Inventory Sheet" done in March 1999 correctly showed

---

[5]    Throughout his deposition, Mr. Bybee refers to the Poles 049 and 050 simply as Pole 49 and Pole 50, respectively. The Court will continue to use Pole 049 and 050.

that Pole 050, a 45 foot pole, as being owned by WAPA. Mr. Bybee repeatedly testified that, at the time of the accident, Pole 049 and the broken Pole 050 were owned by VITELCO and explained the significance:

> [i]n terms of the pole failure and the Poles 50 and 49 were too small for the situation, that—and those were both Vitelco poles—that responsibility for Poles 49 and 50 is entirely Vitelco's.

(Bybee Dep. at 50: 13-17.) VITELCO had the smaller poles in the area, which is significant not only to show ownership but also to show liability. He goes on to state:

> A: And as a matter of fact, in the 1959 Joint Use Agreement and the 1998 Joint Use Agreement, you could not have used a 35-foot, class 4 pole for poles 49 and 50.
> Q: And you impute that knowledge on Vitelco.
> A: They own the pole. If WAPA owned those poles, I would impute that knowledge to WAPA.

(Bybee Dep. at 53:13-19.) Similarly, Mr. Chance testified that <u>VITELCO agreed that "based on the agreement, if the pole belongs to VITELCO, [VITELCO is] responsible for the maintenance of that pole</u>." (Chance Dep. at 11: 13-15, April 18, 2002.) (emphasis added)

Mr. Bybee was not the only witness who testified that VITELCO owned the poles in question at the time of the accident. Mr. Vincent Maynard, Line Superintendent of WAPA, also testified as such. Using drawings of Map 37A and 37E (Maynard Dep. I at 11:17-21), Mr. Maynard identified poles 050 and 049[6] at the time of the accident as VITELCO poles. They were 35 foot, class 4 poles and had no WAPA identification markers on them.[7] (*Id.* at 16: 9-11, 19-25; 17: 1, 18-19; 18: 12-15; 20: 24-25; 22: 4-6; 26: 24-25.) This testimony is consistent with

---

[6]  Throughout his Deposition, Mr. Maynard refers to Poles 049 and 050 as Poles E and D respectively. Mr. Maynard labeled the poles on the drawing provided by VITELCO A through F. (See Maynard Dep. Ex 2.)

[7]  VITELCO deposed Mr. Maynard a second time in January 2005. At that time Mr. Maynard could only recall that the downed pole—or Pole 050—had belonged to VITELCO, but could not remember who owned Pole 049. (Maynard Dep. II at 19: 6-7, Jan. 30, 2005.) The Court accords more credence to Mr. Maynard's memory in the first deposition taken in 2002, than his memory in 2005 and finds that he properly identified VITELCO as the owner of both Poles.

11

Ms. Harris', who testified that all the 35 foot, class 4 poles in that area were owned by VITELCO. Additionally, Mr. Dennis Connor, who was the First Class Lineman present with Plaintiff at time of the accident, testified that Poles 049 and 050[8] were 35 foot poles, though he could not recall who owned them. (Connor Dep. at 26: 19-25, June 30, 2005 (He stated the poles were 35 or 30 foot poles.))

Finally, Mr. Kenval Thomas, identified Pole 050,[9] at the time of the accident laden with two telephone cables, as a VITELCO Pole, (Thomas Dep. at 19: 9-13, 20: 12-14 Aug. 30, 2005) though he could not recall whether it was a 35 foot or 45 foot pole. (*Id.* at 19: 6.) He also stated that Pole 049 was owned by VITELCO. (*Id.* at 18: 25.)

Defendant VITELCO was deposed through its representative, Mr. Dennis Chance, on April 18, 2002, to establish among other things the ownership of Poles 049 and 050 at the time of the accident. Plaintiff's "Second Amended Notice of Federal Rule of Civil Procedure 30(B)(6) Deposition of Virgin Islands Telephone Corporation" attached to Mr. Chance's Deposition as Exhibit No. 1, specifically requested that Defendant be prepared to testify about (a) "the identification by pole number of all poles carrying electrical power or telephone or cable lines in the vicinity of Feeder 5 between the WAPA Krum Bay Plant, oil dock and FEMA Building as they existed on September 27, 1998 and changes thereafter" and (b) "the identity of the owner of any poles carrying power or telephone or cable lines known to you [in same area]." Defendant showed up for the Deposition unprepared.

He brought several maps to the Deposition. However, these maps did not show ownership of the poles in question at the time of the accident and did not definitively show ownership of other poles. The Maps, according to Mr. Chance, indicated telecommunication routes in the area as well as showing changes to the tracks by work orders done on the lines. (Chance Dep. at 18: 24-25; 20: 6-13.) Map 37-E displayed the Poles in question but did not indicate ownership. (*Id.* at 22: 10-11; 23: 5-11.) Mr. Chance stated that one would have to physically observe the pole to determine if in fact it belonged VITELCO or WAPA. (*Id.* at 24: 6-9.) While he neither denied nor admitted that Pole 049 was owned by

---

[8]    Like Mr. Maynard, Mr. Connor throughout his Deposition refers to Poles 049 and 050 as Poles E and D respectively.

[9]    Like Mr. Maynard and Mr. Connor, Mr. Thomas, throughout his Deposition, refers to Poles 049 and 050 as Poles E and D respectively.

VITELCO at the time of the accident, (*id.* at 24: 22-25; 25: 1-5) <u>he denied the existence of any documents other than those he had brought with him that would show ownership of the poles</u>. (*Id.* at 29: 3-6.) (emphasis added). This denial clearly included the "VITELCO Inventory Pole Sheet" and the document admitted into evidence as Defendant's Exhibit No. 1 during the evidentiary hearing. It was VITELCO's intent that Mr. Chance would testify at trial that Poles 049 and 050 were owned by WAPA and not VITELCO.[10] It was also Defendant's contention that it had just uncovered the Pole Inventory Sheet on June 19, 2006 after over five years of discovery, and would use it to further establish that it did not own the poles in question.

## C. Reasons for Sanctions

The belated disclosure by Defendant of the "VITELCO Pole Inventory Sheet" was for the sole purpose of perpetrating a fraud on the Court. Defendant knew or should have known that pole 50 as listed on the Sheet was <u>not</u> the same pole 50 which was broken at the time Plaintiff sustained his injuries. Plaintiff's injuries occurred in September 1998. The "VITELCO Pole Inventory Sheet" is dated March 18, 1999, approximately six (6) months after the accident.

Defendant knew that WAPA had replaced the broken pole 50 because Defendant failed to do so in a timely manner and because of the need to provide electricity to FEMA after Hurricane George. Thus, while the "VITELCO Pole Inventory Sheet" correctly identifies pole 50 as owned by WAPA in March 18, 1999, WAPA did not own the broken pole 50 at issue in this action in September 1998.

A review of "VITELCO's Pole Inventory Sheet" reveals that with the exception of pole 50, which is a forty-five (45) foot pole, poles 48 through 53 are all thirty-five (35) foot poles. The record is uncontroverted that all 35 foot poles were owned by Defendant. Even though "VITELCO's Pole Inventory Sheet" shows WAPA as the owner of these poles, Ms. Harris testified that this was an error and a revised sheet was prepared to reflect Defendant VITELCO as the true owner of those poles. Had the inventory been taken at the time of the accident, it

---

[10]   This testimony would, at best have been misleading, particularly with respect to Pole 050, because WAPA replaced it for the broken pole and thus owns the current pole. However, present pole 050 is not the broken pole 050 to which the de-energized wire was attached at the time of the accident.

13

clearly would have been reflected that poles 48 through 53, including the broken pole 50 were owned by Defendant.

The Court accords no credence to Defendant's Exhibit No. 1 which purports to be the Revised Pole Inventory Sheet referred to by Ms. Harris. In the first place, this document bears no resemblance to their "VITELCO Pole Inventory Sheet." Unlike the latter, Defendant's Exhibit No. 1 is titled "VITELCO, WAPA, CATV and PWD Pole Inventory Sheet." Also, unlike the "VITELCO Pole Inventory Sheet" which identifies the location of the poles, no location appears on Defendant's Exhibit No. 1. Furthermore, the general format of the documents bears no similarity to each other and while the "VITELCO Pole Inventory Sheet" states that it is "Page 144 of __," Defendant's Exhibit No. 1 states that it is "Sheet 144".[11]

The efficacy of both documents must be questioned. Defendant knew or should have known that the "VITELCO Pole Inventory Sheet" does not accurately reflect WAPA's ownership of pole 50 at the time of the accident but yet presented it to the Court and Plaintiff as such. Defendant's Exhibit No. 1 was similarly presented to the Court and Plaintiff as proof of WAPA's ownership of pole 50 at the time of the accident even though Defendant knew or should have known that the document was also inaccurate, if not false.

The disclosure of these documents, after repeated violation of the Court ordered deadlines for the completion of discovery coupled with Defendant's knowledge that the documents were false, is an affront to the Court's integrity and the administration of justice.

The Court finds Defendant's explanation regarding the late disclosure of the documents implausible and incredible for several reasons and finds that the manner in which Defendant has generally engaged in discovery in this case to be an affront to our system of justice. First, the Court finds it incredulous that Mr. Chance did not know of the existence of the "VITELCO Pole Inventory Sheet" prior to June 19, 2006. Taking inventory of the poles on the island was a huge project jointly embarked upon by both WAPA and VITELCO. Both Ms. Harris and Mr. Samuel

---

[11] The Court notes that on the former document, the page number was originally 143 but the "3" was changed to "4." Inasmuch as both documents were produced by Defendant, the reason for the change is unclear and questionable at best.

testified that the project lasted years, at least from 1999 to the end of 2003 and possibly into 2004.

Second, the Court finds VITELCO's explanation that it is a large corporation and simply did not find the document until shortly before trial implausible. The Court does not doubt that VITELCO is a large corporation. However, this matter has been pending since 2000. The documents had been requested since 2001 and VITELCO had a continuing duty to supplement Plaintiff's document production request since then. The ownership of Poles 049 and 050 was critical to determining liability. For Defendant to suddenly discover its Pole Inventory Sheet after six (6) years simply strains credulity.[12] Also, Defendant denied that it was withholding or concealing any other documents and was simply doing its duty in turning over to Plaintiff documents recently discovered. This denial is clearly a misrepresentation to the Court. Defendant's Exhibit No. 1 had never before been disclosed to Plaintiff. It was yet another concealed and withheld document. Moreover, Defendant produced the document on a moment's notice. Such conduct severely undermines VITELCO's argument that it is such a big corporation that it could not always be expected to find such crucial documents and that it lacked bad faith. Both documents were clearly in Defendant's possession during the lengthy discovery process and a diligent search would have, in all probability, revealed their existence. Thus, Defendant knew or should have known it had these documents and must be held accountable for withholding or concealing them until the day before trial.

Finally, in light of all the other testimony that: WAPA's poles in the area were marked while Poles 049 and 050 were unmarked; VITELCO had planted and/or owned all the 35 foot, class 4 poles in the area; four (4) fact witnesses all stated VITELCO owned the poles and Mr. Chance misrepresented to the Court that no other documents existed with respect to pole ownership, the Court simply cannot accept the veracity or accuracy of either the VITELCO's Pole Inventory Sheet or Defendant's Exhibit No. 1.

---

[12] The Court also notes that there is a facsimile date of July 11, 2005 on bottom of the document. The Court notes that that date was exactly two weeks before this case was originally set to go to Trial, hence Defendant was aware of its existence at least then.

It is not the withholding of the "VITELCO Pole Inventory Sheet" alone upon which the Court bases its decision. Defendant in this case has engaged in a "pattern and practice of stonewalling, bad faith, lack of candor and stalling tactics." *Derzack v. County of Allegheny*, 173 F.R.D. 400, 416 (W.D. Pa. 1996). Courts have considered such conduct when imposing sanctions for abuses of the litigation process. *See e.g., Chambers*, at 51, 111 S. Ct. at 2137; *Chrysler*, 186 F.3d at 1020.

Defendant's most recent example of abuse of the litigation process in this case involves its two (2) "Motions to Compel" filed in January and May 2006. In its attempt to obtain a Court Order compelling Plaintiff to answer interrogatories served long after discovery was ordered closed, Defendant made several misrepresentations to the Court, claiming that Plaintiff was acting in bad faith. Specifically, Defendant stated that Plaintiff simply ignored its letters and telephone calls calendaring "meet and confers" because he had failed to show up on three different occasions. In his Opposition to the Motion, Plaintiff contended that Defendant was the culpable party by not showing up each time meetings were scheduled, unilaterally scheduling the "meet and confers," and blatantly ignoring the discovery procedures set forth in the rules. Defendant offered no reply to Plaintiff's contentions in his Opposition.

Defendant has also repeatedly attempted to delay disposition of this matter. The five-year delay in producing the Pole Inventory Sheet was just the catalyst for the Motion *sub judice*. Three years into the litigation, VITELCO filed its "Motion Requesting Permission to File Third Party Complaint" to add WAPA as a Party Defendant. The Court denied the Motion finding that "Vitelco's unreasonable and unjustified delay in seeking to implead WAPA will cause substantial prejudice to plaintiff. Discovery has been completed and the case is ready for trial." (*Battiste v. Virgin Islands Telephone Corp.*, Civil No. 285/2000, Memorandum Opinion, Apr. 5, 2005.)[13]

On August 31, 2005, five years into the litigation and after discovery was ordered closed and the matter set for trial, Defendant attempted another dilatory tactic by filing an action for declaratory judgment against Plaintiff and WAPA. On April 3, 2006, Defendant then

---

[13]    This Opinion was drafted by the Judge previously assigned to this case. The week before trial Defendant filed a "Motion for Reconsideration" asking the Court reconsider this decision. The Court struck the Motion however as it was filed by counsel not of record and the Court viewed it as yet another delay tactic by VITELCO.

proceeded to file a "Motion Requesting Continuance of Trial" in the underlying matter seeking to have the matter stayed until the declaratory judgment action was resolved. The Court orally denied the Motion at the pre-trial conference held on May 16, 2006.

Plaintiff has been prejudiced by Defendant's attempt to ambush him at trial. Plaintiff was fortunate enough to uncover the intended use of the "VITELCO Pole Inventory Sheet" and contact one witness, Ms. Lisa Harris, in time for the evidentiary hearing. However, the evidence reveals that there are other documents including the summary of the inventory project and other witnesses that are indispensable to a fair trial. In other words, Plaintiff was about to go "to trial lacking evidence it would have had but for the deceit of the [D]efendant[]." *Chrysler*, 186 F.3d at 1021. "The very integrity of the civil justice system depends on compliance with the discovery rules. Discovery cannot be a game of hide-and-seek. ... When discovery requests are made by a party, the party to whom the request is made has an obligation to respond accurately and fully." *Hogue v. Fruehauf Corporation*, 151 F.R.D. 635, 639 (C.D. Ill. 1993). Defendant's actions of concealing and denying the existence of evidence are clearly affronts to this Court and the administration of justice.

Defendant's suggested sanction of simply withdrawing the offending document is inappropriate given the scope of its transgressions. As in *Derzack*, Defendant's offer to voluntarily withdraw the Pole Inventory document shortly after "the handwriting was on the wall" and Defendant "knew [it] had been caught" is taken by this Court "with a grain of salt." *Derzack*, 173 F.R.D. at 416 (W.D. Pa. 1996). "The failure of a party's corrupt plan does not immunize the defrauder from the consequences of his misconduct." *Derzack v. County of Allegheny*, 173 F.R.D. 400, 415 (W.D. Pa. 1996) (citation omitted). In addition, in the context of fraud and deceit, "monetary sanctions may be inherently inadequate to remedy the harm to the public interest in preserving the integrity of the courts, and in deterring future misconduct on the part of other litigants." *Derzack v. County of Allegheny*, 173 F.R.D. 400, 417 (W.D. Pa. 1996) citing *In re Tutu Wells I*, 162 F.R.D. at 78.

Plaintiff seeks the imposition of default against Defendant. Like the Court in *Hogue,* this Court is "reluctant to impose the penalty of default on the issue of liability as a sanction because the Court fully supports the proposition that claims should be determined on their merits." *Hogue v.*

17

*Fruehauf Corporation*, 151 F.R.D. 635, 639 (C.D. Ill. 1993). As with the defendant in *Hogue,* however, VITELCO's "conduct can, at best, be characterized as involving callous disregard for its responsibilities owed to the Court ... and the Plaintiff in this case." *Id.* Thus, severe sanctions are in order.

## III. CONCLUSION

■ Based upon the foregoing, the Court is satisfied that Defendant's discovery violations and other dilatory tactics were willful and deliberate and designed to perpetrate a fraud on the Court, undermine its integrity and frustrate the administration of justice. Such conduct by Defendant was aimed at "interfer[ing] with rightful decisions of [this] case." *Chambers, supra.* For such wrongful conduct, the sanction of Default Judgment on the issue of liability is appropriate both to penalize Defendant and "to deter those who might be tempted to such conduct in the absence of a deterrent." *In re Tutu Wells Contamination Litigation, supra.*